69405. INTEGRATED MICRO SYSTEMS, INC. v. NEC HOME ELECTRONICS (USA), INC. et al.
(329 SE2d 554)

POPE, Judge.

Plaintiff/appellant Integrated Micro Systems, Inc. (IMS) brought this action against defendant/appellees NEC Home Electronics (USA), Inc.; Bio-Lab, Inc.; and several individual representatives of both corporations. IMS based its complaint on claims of tortious interference with contractual relations, breach of contract and tortious interference with business relations. Following extensive discovery, appellees moved for summary judgment. IMS brings this appeal from the trial court's grant of appellees' motions.[1]

IMS sells and services personal computers and related computer equipment. NEC distributes personal computers and other related computer equipment manufactured by its parent company, NEC Corporation. In April 1982 IMS entered into a dealer agreement with NEC and became an authorized NEC dealer. Bio-Lab, Inc. is in the business of selling swimming pool chemicals and supplies to retail pool supply dealers nationwide who, in turn, resell to the consuming public. Bio-Lab also resells personal computers to its dealers. These

---

[1] Between the time appellees filed their motions for summary judgment and the trial court's ruling thereon, IMS amended its complaint to assert a claim based on quantum meruit. The motions for summary judgment did not address this claim, and it remains pending below. IMS also has dismissed the various individual defendants without prejudice.

computers are used by the dealers to analyze the chemical composition of a customer's swimming pool water and to make recommendations about chemicals which should be added to the pool water.

Prior to June 1982 Bio-Lab began to seek a new supplier of personal computers suitable for its dealers. Bio-Lab contacted another computer manufacturer which in turn contacted IMS. After preliminary meetings between IMS and Bio-Lab, Bio-Lab selected the NEC personal computer model PC 8000 for resale to its dealers. Bio-Lab was willing to consider purchasing the NEC computers from IMS but wanted IMS to provide written assurances from NEC that NEC would "support" any sales made by IMS to Bio-Lab and the resale of the computers by Bio-Lab to its dealers. That is, Bio-Lab needed to be assured that NEC, with its national system of service centers, would service Bio-Lab's nationwide network of pool supply dealers, and also would continue supplying Bio-Lab with computers if "something happened to IMS." Bio-Lab was concerned about IMS's ability, as a dealer, to perform service functions which in the past had been performed by manufacturers. In September 1982 Bio-Lab and IMS entered into a "Contract Agreement for Sales." This agreement was prepared by IMS. At the same time, however, Bio-Lab sent IMS a letter reaffirming that IMS would have to obtain a letter of total support from NEC before Bio-Lab would make any purchases. Bio-Lab never received such a letter. Ultimately, NEC sold PC 8000s directly to Bio-Lab as a "value added" dealer, i.e., a dealer that buys a computer, adds hardware or software to it, and then resells the "value added" computer to an end user.

1. IMS first assigns error to the trial court's conclusion that the IMS/Bio-Lab agreement was not a requirements contract and therefore could not be the subject of an action for tortious interference with contractual relations and also could not be the subject of an action for breach of contract. The trial court found "that there is no requirement resting on Bio-Lab to make any purchases from IMS. Indeed, the purported agreement between the parties never obstensibly or implicitly specified or alluded to any quantity of computers to be purchased by Bio-Lab. As such, the purported sales contract between IMS and Bio-Lab is too indefinite to be classed as an enforceable contract." We concur in this finding.

"A requirements contract obligates the buyer [here, Bio-Lab] to purchase all the goods that the buyer will need for a particular use contemplated by the parties. For example, a contract to purchase all the coal the buyer will need to operate the furnaces in his factory is a requirements contract. . . . There can be no true requirements contract unless the buyer is under an obligation to purchase all of its requirements from the seller. In the absence of such an obligation, there is no requirements contract and 'the promise of the seller be-

comes merely an invitation for orders and a contract is not consummated until an order for a specific amount is made by the buyer.' " 2 Anderson, Uniform Commercial Code, § 2-306:9 at 513, 514 (3rd ed. 1982). See also OCGA § 11-2-306. IMS argues that its agreement with Bio-Lab provided for an annual "unit quota" of 200 units (computers). It is clear from the context of the agreement, however, that the "unit quota" did not represent an obligation on the part of Bio-Lab to purchase 200 computers. Rather, it was simply one component of the pricing structure set forth in the agreement. Our review of the subject agreement discloses nothing which contractually obligated Bio-Lab to purchase any computers from IMS. The agreement itself merely delineated a schedule of prices and set forth the terms and conditions of sale which would apply if orders were made.

IMS attempts to bolster the patent deficiency of the agreement itself by citing to certain deposition testimony and other documents of record as evidence of a course of dealings between the parties. For example, at the time of the execution of this agreement Bio-Lab's twelve-month marketing goal was to purchase 200 NEC computers from IMS for purposes of resale to their pool supply dealers. Also at this time, Bio-Lab intended to purchase all needed NEC computers through IMS. After execution of this agreement, Bio-Lab ordered two units pursuant to the agreement and issued checks at the discount level designated in the agreement for purchases of 200 units or more. (The record also shows that Bio-Lab reimbursed IMS for the amount of the discount on these units when Bio-Lab decided to discontinue ordering NEC computers through IMS). Finally, IMS cites a letter written to it from Bio-Lab on the same day the agreement was executed. The letter, however, only purports to recapitulate several items previously discussed between the parties and to request assistance on a couple of new items.

None of the foregoing evidence, even construed most favorably to IMS, is sufficient to transform the subject agreement from a mere "invitation for orders" into a binding requirements contract. In any event, the agreement itself provided "that this agreement is the complete and exclusive statement of the mutual understanding of the parties. . . ." Compare *O. N. Jonas Co. v. Badische Corp.*, 706 F2d 1161 (11th Cir. 1983), wherein the existence of a requirements contract was established by a written memorandum, sufficient to meet the statute of frauds requirement of OCGA § 11-2-201, taken in the context of business dealings between the parties. We conclude, therefore, that the trial court properly entered summary judgment in favor of Bio-Lab on IMS's breach of contract claim. Accord *Waco Fire &c. Ins. Co. v. Plant*, 150 Ga. App. 888 (1) (259 SE2d 95) (1979), and cits. It follows that, absent an enforceable contract between the parties, IMS could not recover against NEC for tortious interference with IMS's

contractual relations with Bio-Lab. See *Wedgewood Carpet Mills v. Color-Set, Inc.*, 149 Ga. App. 417 (3) (254 SE2d 421) (1979). Accord *Charles v. Simmons*, 215 Ga. 794 (3) (113 SE2d 604) (1960); *Nestlé Co. v. J. H. Ewing & Sons*, 153 Ga. App. 328 (2) (265 SE2d 61) (1980).

2. IMS next assigns error to the trial court's findings as a matter of law that the dealer agreement executed by NEC and IMS could not be the subject of an action for tortious interference with contractual relations and could not be the subject of an action for breach of contract. The essence of this argument is that IMS's dealer agreement with NEC was breached by NEC and interfered with by Bio-Lab when those two parties began to deal directly with one another. As the result of this direct dealing, Bio-Lab became a value added dealer for NEC.

The dealer agreement provides: "DEALER'S [IMS] appointment as an authorized NEC dealer shall be on non-exclusive basis. Such appointment does not constitute a grant of any specific territory or geographical area. NEC reserves the absolute right for any reason whatsoever to increase or decrease the number of authorized NEC dealers in the vicinity of DEALER'S store(s) at any time without notice to DEALER." It is thus patently clear that NEC was free, under the terms of its dealer agreement with IMS, to appoint Bio-Lab as an authorized NEC dealer. See also *Alice v. Robett Mfg. Co.*, 328 FSupp. 1377 (N.D. Ga. 1970). This being so, Bio-Lab, by becoming an authorized NEC dealer, in no way interfered with any contractual right obtained by IMS pursuant to its dealer agreement with NEC. The trial court properly granted summary judgment in favor of NEC on IMS's breach of contract action and in favor of Bio-Lab on the tortious interference with contractual relations claim.

3. Finally, IMS enumerates as error the trial court's conclusion that, based on the court's grant of summary judgment against IMS on its breach of contract and tortious interference with contractual relations claims, IMS's claim for tortious interference with business relations was without merit. Clearly, in light of our holdings in Divisions 1 and 2 of this opinion, there was no contractual bar prohibiting NEC and Bio-Lab from dealing directly with one another. However, a cause of action for tortious interference with business relations does not require proof of a valid and enforceable contract. "In establishing a cause of action for malicious [or tortious] interference with business relations, a plaintiff [here, IMS] must demonstrate that the defendant [here, NEC] (1) acted improperly and without privilege, (2) purposely and with malice with the intent to injure, (3) induced a third party or parties not to enter into or continue a business relationship with the plaintiff, and (4) for which the plaintiff suffered some financial injury." *Hayes v. Irwin*, 541 FSupp. 397, 429 (N.D. Ga. 1982); see

*NAACP v. Overstreet*, 221 Ga. 16, 21 (142 SE2d 816) (1965), cert. dismissed, 384 U. S. 118, rehg. den., 384 U. S. 981 (1966).

In support of this claim IMS alleges that in October 1982, subsequent to the IMS/Bio-Lab agreement, NEC presented false information to Bio-Lab personnel concerning IMS's financial condition and stated that IMS did not have the financial capabilities to fulfill the terms of the IMS/Bio-Lab agreement. IMS also alleges that at this same time, after having been fully aware of IMS's dealings with Bio-Lab over a period of several months, NEC informed Bio-Lab that the IMS/Bio-Lab agreement violated the terms of the dealer agreement between IMS and NEC. IMS had not previously been advised of this "violation." Finally, IMS alleges that NEC then offered Bio-Lab "national account" status with significantly better pricing than that offered under the IMS/Bio-Lab agreement. It is thus apparent that IMS is proceeding in this cause of action solely against defendant NEC, and not against defendant Bio-Lab.

NEC counters these allegations by relying upon its dealer agreement with IMS which provides: "DEALER [IMS] shall not sell NEC products for the purpose of resale to customers other than consumers unless DEALER has notified NEC by registered or certified mail of the name and address of DEALER's proposed customer and has received NEC's advance written consent to such proposed sale." The dealer agreement also provides: "This agreement, or any part hereof, may not be modified, waived, or changed except in writing signed by both parties hereto." NEC also alleges that IMS could not have converted the NEC computers to accept Bio-Lab's water analysis program without proprietary information available only with the assistance of NEC's parent corporation. Since the IMS/Bio-Lab agreement was specifically subject to conversion of the water analysis program for use on the NEC computer, NEC argues that the business relationship between IMS and Bio-Lab could not have continued.

It is apparent that NEC's summary judgment motion on IMS's claim for tortious interference with business relations was based solely on the theory that the evidence of record conclusively established that its actions in dealing with Bio-Lab were entirely proper. We will therefore limit our discussion here to this one element, having been cited to no other evidence of record which would warrant summary judgment on this issue. As to NEC's latter allegation noted above, the evidence of record discloses that from late summer through early fall 1982, NEC employees were directed to cooperate with Bio-Lab by providing necessary technical information so that Bio-Lab could begin purchasing computers from IMS for the purpose of resale to Bio-Lab's pool supply dealers. Although NEC was under no contractual obligation to provide such information to Bio-Lab on behalf of IMS, the fact that NEC had initially done so prior to its dealing

directly with Bio-Lab is certainly a factor to be considered in determining whether NEC acted improperly.

NEC also bases its contentions of proper activity on the above-cited provision of its contract with IMS which precludes IMS from selling NEC products for the purpose of resale to customers other than consumers without NEC's prior written consent. It is not disputed that Bio-Lab was a customer other than a consumer and that such prior written consent was never obtained. Clearly, if IMS's agreement with Bio-Lab was executed in violation of the terms of IMS's contract with NEC, the IMS/Bio-Lab agreement would be illegal (see Restatement of Contracts, § 576 (1932)), thus obviating any impropriety in NEC dealing directly with Bio-Lab. However, the evidence of record is not dispositive of this issue and presents questions of fact as to whether NEC's actions in this case during and subsequent to IMS's negotiations with Bio-Lab amounted to a waiver of the dealer agreement provisions barring IMS from sales to customers such as Bio-Lab and, if such a waiver is found, whether NEC retracted it. See generally OCGA § 11-2-209. "[A] jury question is also raised as to whether the anti-waiver provision in the [subject agreement] was itself waived." *Smith v. Gen. Finance Corp. of Ga.*, 243 Ga. 500, 501 (255 SE2d 14) (1979).

Under these circumstances, IMS's claim for tortious interference with business relations was not amenable to summary adjudication, and the trial court's entry of summary judgment on this issue is reversed. See also *Bodge v. Salesworld, Inc.*, 154 Ga. App. 65 (267 SE2d 505) (1980); *Architectural Mfg. Co. v. Airotec, Inc.*, 119 Ga. App. 245 (166 SE2d 744) (1969). Summary judgment in favor of Bio-Lab on this issue is affirmed.

*Judgment affirmed in part; reversed in part. Banke, C. J., and Benham, J., concur.*

## On Motion for Rehearing.

As to Division 3 of our opinion, NEC argues on rehearing that it was "privileged" under the terms of its dealer agreement with IMS to also enter into a dealer agreement with Bio-Lab. See Division 2, supra. That is, NEC contends that it was free to "compete" with IMS for Bio-Lab's business. Assuming arguendo that NEC and IMS were "competitors" for Bio-Lab's business, in order for NEC to come under the protection of the competition privilege, it must establish inter alia that it did not employ improper means. See *Orkin Exterminating Co. v. Martin Co.*, 240 Ga. 662, 666 (242 SE2d 135) (1978). The evidence of record, as noted in Division 3, does not conclusively establish the propriety of the means employed by NEC in its "compe-

tition" with IMS for Bio-Lab's business.
*Judgment adhered to.*

DECIDED MARCH 12, 1985 —
REHEARING DENIED MARCH 27, 1985 —

*John H. Ridley, Jr.*, for appellant.
*Sidney Parks, Peyton S. Hawes, Jr., Randolph A. Rogers, Gerald L. Morel, Stephen M. Proctor, James R. Mitchell*, for appellees.