**THOMAS J. KLINE, INC.,**
Plaintiff–Appellee,

v.

**LORILLARD, INC.,**
Defendant–Appellant.

No. 88–3011.

United States Court of Appeals,
Fourth Circuit.

Argued Nov. 3, 1988.

Decided June 30, 1989.

Rehearing and Rehearing In Banc
Denied Sept. 14, 1989.

Franklin Poul (Debra Klebanoff, Stanley R. Scheiner, Wolf, Block, Schorr and Solis–Cohen, Philadelphia, Pa., Fenton L. Martin, James R. Chason, Whiteford, Taylor & Preston, Baltimore, Md., on brief), for defendant-appellant.

Louis Burton Price (Holly N. Lindeman, David R. Sonnenberg, Melnicove, Kaufman, Weiner, Smouse & Garbis, P.A., Baltimore, Md., on brief), for plaintiff-appellee.

Before WINTER, SPROUSE, and CHAPMAN, Circuit Judges.

CHAPMAN, Circuit Judge:

On January 15, 1986, Lorillard, Inc., a tobacco products manufacturer, agreed to sell tobacco products to Thomas J. Kline, Inc. and granted Kline certain credit. In early February, 1986, it abruptly informed Kline that future orders would be filled only if accompanied by cash. A jury in the District of Maryland found that Lorillard's revocation of credit was both a breach of contract and a violation of the Robinson–Patman Act, 15 U.S.C. § 13 (1982). The verdict awarded Kline $2,053,466 in compensatory and punitive damages, and the court set attorney's fees of $306,727.80, and issued a permanent injunction against future Robinson–Patman violations. Lorillard appeals the breach of contract and Robinson–Patman verdicts. Alternately, it submits that the damages awarded were improper. We reverse.

## I.

Events relative to this dispute commenced long before 1986. From 1977 to 1980 Thomas J. Kline was the owner of William B. Merrey and Sons, Inc., an Elkton, Maryland tobacco distributor. In late 1980 Kline sold Merrey to M. Paolella and Sons, a large Philadelphia tobacco wholesaler. Over the next five years, Kline served as manager of Merrey, which had become a subsidiary of Paolella. Primarily because of his good relations with Paolella, Kline was able to repurchase Merrey in December 1985. In January 1986 Paolella went into bankruptcy, resulting in substantial losses to its cigarette suppliers, including Lorillard.

The enormous cost of Kline's purchase of Merrey, and the immediate business necessity of establishing purchasing agreements with leading tobacco manufacturers, required that Kline obtain operating funds. Kline first acquired from Maryland National Industrial Finance Corporation (MNIFC) a $3.75 million letter of credit backed largely by future inventory and accounts receivable. Kline also arranged to purchase cigarettes at wholesale prices from each of the six major cigarette manufacturers, including Lorillard. In December 1985 Lorillard granted Kline certain credit terms orally. A January 15, 1986 letter was written by Lorillard to Kline explaining credit, regular terms and discounts for prompt payment. Briefly stated, the letter allowed Kline to order goods without immediately wiring cash and provided discounts if payments were either mailed or received within 15 days of invoice.

In late January 1986, the Lorillard–Kline arrangement underwent considerable change. The primary reason was Maryland National Industrial Finance Corporation's January 30 foreclosure of Paolella. Paolella's demise impacted on Kline and Lorillard for several reasons. First, because MNIFC maintained the first lien on Paolella's inventory, including a large quantity of Lorillard brand cigarettes, Lorillard lost about $700,000 in the MNIFC seizure. Second, Paolella's collapse was a cue for tobacco distributors, including Kline, to begin a scramble for business left unserviced by Paolella's bankruptcy. This resulted in Kline submitting an unusually large $30,000 order to Lorillard on January 31. Kline acquired another tobacco distributorship in anticipation of increased business. Third, Lorillard believed that Paolella's creditor, MNIFC, was a "nervous lender." This raised Lorillard's fears that MNIFC might also foreclose on Kline.

More seriously, Lorillard felt that Kline's last minute purchase of Merrey suggested a fraudulent collusion with Paolella. Although the parties disagree as to which of these factors was determinative, on either January 31 or February 3, when Lorillard received Kline's $30,000 order, it suspended the previous credit arrangement and required Kline to wire cash for its purchases. Within a few weeks Kline produced and Lorillard accepted a letter of credit and renewed 15 day terms for Kline's purchases. Kline argued at trial that in the period before he could obtain a letter of credit he was prevented from enjoying a unique opportunity to expand into the Philadelphia tobacco market.

## II.

■ Appellant Lorillard contends that Kline's breach of contract claim is barred by Maryland's Statute of Frauds. *Md. Comm.Code Ann.* § 2–201 (1975).[1] There is no disagreement that the statute applies to this transaction, and that the only writing evidencing the deal is a confirmatory memorandum sent to Kline by Lorillard on January 15, 1986. The question is whether the Maryland Statute of Frauds bars recovery for breach of contract. The entire text of this writing states:

January 15, 1986

Mr. Thomas J. Kline
President
Thomas J. Kline, Inc.
D/B/A W.B. Merry & Sons
555 Blueball Road
Elkton, Maryland 21921

Dear Mr. Kline:

We are pleased to inform you that your request to purchase Lorillard products on a direct basis has been approved by our New Accounts Committee, and you have been added to our direct list of customers for Full Line as successor to W.B. Merry & Sons, Inc.

Our terms are:

REGULAR TERMS: 2% cash discount on invoices if payment is mailed no later than the 15th day after invoice date.

ANTICIPATORY DISCOUNT: 1.25% cash discount (total discount 3.25%) is available if payment is RECEIVED at our remittance address no later than the 15th day after invoice date.

Enclosed is our price list No. 61, dated July 22, 1985 with supplements.

Each of our customers is assigned an individual computer processing number to be included when submitted phone or mail orders.

YOUR NUMBER IS: 159–378–000–2

Please mail your remittances to:

LORILLARD, INC.
P.O. Box 6390
Church Street Station
New York, NY 10249

In Maryland it is well established that a writing satisfies the requirements of the Statute of Frauds if (1) it evidences a contract for the sale of goods, (2) it is signed by the party against whom it is to be enforced, and (3) it specifies the quantity of goods to be sold. *Cavalier Mobile Homes v. Liberty Homes, Inc.*, 53 Md.App. 379, 395, 454 A.2d 367, 376–77 (1983). Because the writing obviously evidences the sale and was signed by Lorillard's agent, the issue becomes whether the memorandum adequately "specifies the quantity of goods to be sold." More precisely, the requirement in Maryland is that there must be "some writing which indicates ... the quantity to be delivered." *Cavalier Mobile Homes*, 53 Md.App. at 395, 454 A.2d at 377.

Kline's position is that the memorandum's references to "direct basis" and "Full Line" satisfactorily prove the quantity term. Even Kline, however, admits that these terms are not in themselves clear as

---

**1.** § 2–201 Formal requirements; statute of frauds

(1) Except as otherwise provided in this section, a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has

been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

to Lorillard's contractual obligation. As a result, Kline testified as to the meanings of "direct basis" and "Full Line." Normally, such supplementation of a written memorandum should be permitted. Md.Comm. Code Ann. § 2–202 (1975). In fact, Maryland expressly allows parol evidence of "course of dealing," "usage of trade" or "course of performance" to explain written memoranda, so long as such evidence does not contradict the plain language of an agreement.

In submitting parol evidence appellee contended that the words "direct basis" created an obligation to supply Kline with all of his tobacco requirements, and that they required Lorillard to provide Kline with credit for his requirements on 15–day terms. Kline also introduced testimony suggesting that such arrangements were traditional in the tobacco distribution business, and had always been the manner of business between himself and Lorillard. Conversely, Lorillard contended that such terms created neither a requirements contract nor unlimited credit. It argued that "direct basis" and "Full Line" merely entitled Kline to buy Lorillard products directly from the manufacturer.

Before evaluating whether this course of dealing evidence is sufficient, we must consider whether there is any language in the memorandum *itself* which might satisfactorily indicate "the quantity to be delivered." This initial inquiry is plainly required by Maryland's requirement of a *written* quantity term. The general rule is that "when quantity is not precisely stated, parol evidence is admissible to show what the parties intended as the exact quantity ... but where the writing relied upon to form the contract of sale is totally silent as to quantity, parol evidence cannot be used to supply the missing quantity term." *Alaska Independent Fishermen's Marketing Assn. v. New England Fish Co.*, 15 Wash. App. 154, 159–60, 548 P.2d 348, 352 (1976). *Accord: Great Northern Packaging, Inc. v. General Tire & Rubber Co.*, 154 Mich. App. 777, 399 N.W.2d 408 (1986); *In the Matter of Estate of Warren Bert Frost*, 130 Mich.App. 556, 344 N.W.2d 331 (1983); *Cox Caulking & Insulating Co. v. Brock-*

*ett Distributing Co.*, 150 Ga.App. 424, 258 S.E.2d 51 (1979).

A review of decisions on this point reveals that there is not a single Maryland case where terms similar to those used in Lorillard's memorandum have been found to be sufficient written evidence of quantity. In *Cavalier Mobile Homes*, the Court of Special Appeals held that even where extant *writings* included a series of individual contracts there was insufficient *written* evidence to prove the alleged quantity. *Cavalier*, 53 Md.App. at 395, 454 A.2d at 377. Other courts have come to identical conclusions. For example, Georgia's Court of Appeals recently held that an agreement which "merely delineated a schedule of prices and set forth the terms and conditions of sale which would apply if orders were made" did not, even with evidence of course of dealing, sufficiently specify quantity. *Integrated Micro Systems, Inc. v. NEC Home Electronics (USA), Inc.*, 174 Ga.App. 197, 198–99, 329 S.E.2d 554, 556–7 (1985). *See also Eastern Dental Corp. v. Isaac Masel Co., Inc.*, 502 F.Supp. 1354 (E.D.Pa.1980) (quantities on separate invoices may not indicate requirements contract); *Doral Hosiery Corp. v. Sav–A–Stop, Inc.*, 377 F.Supp. 387 (E.D.Pa.1974) (uncertain quantity on face of orders).

Also instructive are those cases in which ambiguous terms of quantity have been deemed sufficient to prove an enforceable contract. This court, for example, recently held that quantity was adequately identified when specific language "referred to meeting the purchaser's needs." *Barber and Ross Co. v. Lifetime Doors, Inc.*, 810 F.2d 1276, 1280–81 (4th Cir.1987). *See also Kansas Power and Light Co. v. Burlington Northern Railroad Co.*, 740 F.2d 780 (10th Cir.1984) (writings mentioning possible maximum and minimum amounts of shipped coal sufficient to create requirements contract). It has been held that the words "the yarn" for "a potential program" could be sufficient written expression of quantity. *O.N. Jonas Co., Inc. v. Badische Corp.*, 706 F.2d 1161, 1163–64 (11th Cir.1983). Courts have consistently found that words with some possible nexus

to amount, including "all," "bags," or even customary terms such as lot numbers, can provide a basis for the admission of parol evidence. *See also Maryland Supreme Corp. v. The Blake Co.*, 279 Md. 531, 369 A.2d 1017 (1977) (written phrases "for the above mentioned project" and "throughout the job" are sufficient quantity terms).

The January 15, 1986 letter from Lorillard to Kline is totally silent as to quantity despite Kline's contention that the words "direct basis" indicate quantity. A standard definition of quantity is that it is "a particular, indefinite, or considerable amount of anything, ... an exact or specified amount or measure." *Random House College Dictionary*, 1080 (1982). Precisely how one converts "direct basis" into some variety of amount is not adequately explained. There simply is no arguable connection in the law or in the English language between "direct basis" and "amount." Under Maryland law, the testimony of Kline, that for a few weeks in December 1985 and January 1986, Lorillard had filled his orders and extended certain credits and discounts, did not supply the missing ingredient—some indication of quantity.

Therefore, the district court erred in considering only whether "course of dealing" testimony could prove a requirements contract. The court did not give any attention to whether there was sufficient written language in the January 15 letter to allow the introduction of parol evidence. Maryland, by its adoption of the Uniform Commercial Code, has indicated its desire to avoid the unnecessary technicalities of earlier interpretations of the Statute of Frauds, but this is not a case where one party is simply pleading the Statute in order to avoid duties which its actions seem

to have created. Here the issue is whether a one sentence letter obligates Lorillard to provide Kline with unlimited credit for its unlimited tobacco requirements. This is not a case where there is a lack of a "fixed" written quantity. The Code prevents such restrictions. Here there is a lack of something, anything, in the writing that might evidence the quantity dimension of Kline's claim. The Statute of Frauds was enacted to avoid the potential for injustice in precisely these circumstances. Parol evidence cannot create quantity out of thin air, where the writing relied upon to form the contract is silent as to quantity. The Maryland Statute of Frauds is a bar to Kline's breach of contract claim.

### III.

■ Appellant also asserts that the plaintiff did not prove a violation of the Robinson–Patman Act.[2] We find no authority for the plaintiff's claim of a Robinson–Patman violation on the present facts. The trial court in its charge and in its order denying judgment n.o.v. relied upon certain dicta contained in *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 100 S.Ct. 1925, 64 L.Ed.2d 580 (1980); *Craig v. Sun Oil Co.*, 515 F.2d 221 (10th Cir.1975), *cert. denied*, 429 U.S. 829, 97 S.Ct. 88, 50 L.Ed.2d 92 (1976), and *Bouldis v. U.S. Suzuki Motor Corp.*, 711 F.2d 1319 (6th Cir.1983). These decisions, however, are not a sufficient foundation for the building of a jury issue of price discrimination.

*Catalano* was a price-fixing case brought under the Sherman Act and involved an agreement among a number of beer distributors to eliminate short-term trade credit formerly granted to beer retailers, and to require the retailers to pay cash in advance or on delivery. This was a

---

**2.** 15 U.S.C. § 13(a) provides, in part:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or

any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them....

classic horizontal agreement to fix prices, and as the court described it "... the archetypal example of such a [anticompetitive] practice. It has long been settled that an agreement to fix prices is unlawful *per se.*" *Catalano*, 446 U.S. at 647, 100 S.Ct. at 1927; *Catalano* found that the extending of interest-free credit for a period of time was the equivalent of giving a discount equal to the value of the use of the purchase price for that period of time, but the decision turns on the agreement of a group of sellers to eliminate all credit to a group of buyers, and this is the behavior that the court found to be actionable under § 1 of the Sherman Act. *Catalano*, 446 U.S. at 648–49, 100 S.Ct. at 1928–29.

In *Craig v. Sun Oil Co.* the court affirmed summary judgment in favor of the defendants on Sherman Act and Robinson–Patman Act claims. Sun sold tires, batteries and accessories through one Claiborne. After Claiborne sold this business to Craig, Claiborne obtained another franchise from Sun and began operating at another location within the same city. After Craig's service station failed, he sued Sun and Claiborne, asserting that they conspired to destroy his business by means of price, credit and service discrimination. The court found that there was no attempt to monopolize, that there was no conspiracy to restrain trade and that there was neither price nor credit discrimination. It stated:

> The trial court concluded that although there may have been a dispute as to the facts relating to the credit terms and conditions arranged by Sun with Claiborne and those with plaintiff, this made no difference because the discrimination in credit terms as alleged could not, as a matter of law, be the basis for a claim under 15 U.S.C. § 13(a) or (e). We agree with this conclusion.

> It is obvious that differences in the borrower's financial strength, business experience, and many other factors bring about differences in the terms of credit, security required, guarantees, or other devices used by creditors under these circumstances. *See Rea v. Ford Motor Co.*, 497 F.2d 577 (3d Cir.) [1974]; *Skinner v. United States Steel Corp.*, 233

F.2d 762 (5th Cir.) [1956] and *Clausen & Sons, Inc. v. Theo. Hamm Brewing Co.*, 284 F.Supp. 148 (D.Minn.) [1967], reversed on other grounds, 395 F.2d 388 (8th Cir.) [1968]. We do not say that there could not be a discrimination in credit of such magnitude or nature as to constitute a violation, but no such extreme situation was alleged here by any means. *Craig*, 515 F.2d at 224.

The plaintiff in the present action is trying to elevate the dicta contained in the last above quoted sentence to make a jury question of the reasonableness of every credit decision. Yet, we believe *Craig* does not support such a proposition. More accurate is the interpretation of *Craig* articulated in *Carlo C. Gelardi Corp. v. Miller Brewing Co.*, 502 F.Supp. 637 (D.N.J.1980), where the court quoted with approval the language from *Craig* that "... differences in the borrower's financial strength, business experience, and many other factors bring about differences in the terms of credit." The court explained the practical effect of this language to be that:

> In other words, a manufacturer is free to extend different terms to competing purchasers so long as it makes its decisions in a non-discriminatory manner, i.e., the same standards of credit worthiness must be extended to all applicants for credit who are in competition with each other. A showing such as the one made by Geraldi in this case can, therefore, be rebutted by an "affirmative showing that the different terms resulted from legitimate business factors."

*Id.* at 647. As the New Jersey court recognized, the proper review of credit decisions is not reasonableness, as the plaintiff argues, because a seller has the right to sell his wares for cash or on credit. Instead, the appropriate legal test is whether the same standards of credit worthiness are extended to all applicants for credit who are in competition with one another.

The third case relied upon by the plaintiff in the trial court is *Bouldis v. U.S. Suzuki Motor Corp.*, 711 F.2d 1319 (6th Cir.1983). Bouldis was a stockholder and officer of Bold–Morr, a former Suzuki mo-

torcycle dealership, and he brought an action against Suzuki under the Sherman Antitrust Act, 15 U.S.C. § 1, the Clayton Act, 15 U.S.C. § 14, and the Robinson–Patman Act, 15 U.S.C. § 13(a), (d) & (e). After discovery the trial court granted summary judgment for the defendant, which was affirmed on appeal. The Sixth Circuit stated:

> Bold–Morr asserts two arguments to support its claim. First, it is charged that Suzuki initiated and maintained credit programs to enable dealers to purchase Suzuki products, and that Bold–Morr was not permitted to participate in these programs. Bold–Morr asserts that, as a result, its actual cost for motorcycles was greater than that of other Suzuki dealers who were approved for these credit programs. Two programs are cited by Bold–Morr in support of this contention: The "pay as sold" and the Suzuki finance programs.
>
> Both the pay as sold program and the Suzuki finance program were initiated to afford credit to qualified dealers. Suzuki maintains that participation in its credit program is contingent upon a dealer's overall credit worthiness, and, therefore, credit decisions are based upon legitimate business factors. Suzuki presented evidence that its adverse credit decisions with respect to Bold–Morr were based on Bold–Morr's poor financial condition.
>
> Section 2(a) is not violated when credit decisions are based upon legitimate business reasons. See, e.g., Craig v. Sun Oil Company of Pennsylvania, 515 F.2d 221, 224 (10th Cir.1975), cert. denied, 429 U.S. 829, 97 S.Ct. 88, 50 L.Ed.2d 92 (1976). As noted by the Tenth Circuit, decisions involving the extension of credit do not, as a matter of law, constitute a Robinson–Patman violation, since "differences in the borrower's financial strength, business experience, and many other factors bring about differences in the terms of credit, security required, guarantees, and other devices used by creditors under [such] circumstances." Craig, supra, 515 F.2d at 224.
>
> The record shows that Suzuki demonstrated the existence and application of business factors in making its credit decisions. To be eligible under the pay as sold program the dealer was required to meet the following requirements: satisfactory credit history with Suzuki; signing a continuing guaranty; signing a security agreement; obtaining sufficient insurance coverage; and providing a current financial statement. The record also reflects factors used by Suzuki in evaluating the dealer's credit worthiness, such as: the dealer's credit history, net worth, capital, cash position, personal guaranty and success of the dealership. Such financial factors also were used by Suzuki's credit department in determining whether a dealer was eligible for a line of credit under the Suzuki finance program.

*Bouldis,* 711 F.2d at 1325–26. The court then outlined facts that demonstrated a prudent credit decision by Suzuki based on legitimate business factors.

We do not find the holdings of *Catalano, Craig* and *Bouldis* sufficient to support a Robinson–Patman violation on the present facts. *Catalano* was a classic conspiracy case, and *Craig* also involved a claim of conspiracy. Here, there is no allegation of conspiracy. *Bouldis* approved summary judgment for the defendant after looking at the facts underlying the denial of credit. In this regard, it is worth emphasizing that courts have consistently recognized that extension of credit is quite customer specific, and certain facts activate alarms in credit departments and guide credit determinations. Perhaps for this reason, no court has found sufficient facts for Robinson–Patman liability based on a single credit decision involving one seller and one purchaser. *See, e.g., Foremost Pro Color, Inc. v. Eastman Kodak Co.,* 703 F.2d 534, 547–48 (9th Cir.1983), *cert. denied,* 465 U.S. 1038, 104 S.Ct. 1315, 79 L.Ed.2d 712 (1984) (dismissing plaintiff's § 13(a) claim); *Cemar v. Nissan Motor Corp.,* 678 F.Supp. 1091, 1100–01 (D.Del.1988) (dismissing claim against defendants); *O'Connell v. Citrus Bowl, Inc.,* 99 F.R.D. 117 (E.D.N.Y. 1983) (although conceding possibility of § 13(a) liability, court denied motion to cer-

tify plaintiff class); *L.S. Amster & Co., Inc. v. McNeil Laboratories, Inc.,* 504 F.Supp. 617, 620–22 (S.D.N.Y.1980) (granting summary judgment against plaintiffs on credit issue); *Petroleum for Contractors, Inc. v. Mobil Oil Corp.,* 493 F.Supp. 320, 326–28 (S.D.N.Y.1980) (granting defendant's summary judgment motion); *Carlo C. Gelardi Corp. v. Miller Brewing Co.,* 502 F.Supp. 637, 646–48 (D.N.J.1980) (granting summary judgment in favor of defendant); *Robbins Flooring, Inc. v. Federal Floors, Inc.,* 445 F.Supp. 4, 9–10 (E.D. Pa.1977) (although the court failed to grant defendant's 12(b)(6) motion as to the § 13(a) claim, it did not impose liability); *Glowacki v. Borden, Inc.,* 420 F.Supp. 348, 353–54 (N.D.Ill.1976) (possibility of § 13(a) liability conceded, but court decided only not to grant defendant's motion for summary judgment); *Diehl & Sons, Inc. v. International Harvester Co.,* 426 F.Supp. 110, 122 (E.D.N.Y.1976) (denying plaintiffs § 13(a) credit discrimination claim); *Lang's Bowlarama, Inc. v. AMF, Inc.,* 377 F.Supp. 405, 408–09 (D.R.I.1974) (granting summary judgment in favor of defendants). The only question here, then, is that posed by those courts which have left open the possibility of Robinson–Patman liability in credit decision cases where there is an extreme situation "of such magnitude or nature as to constitute a violation." *Craig,* 515 F.2d at 224.

As a matter of law the present case does not present an extreme situation or one of any magnitude. Lorillard had prior payment problems with Kline when Kline owned Merrey in 1979. Kline makes light of this prior credit problem because it occurred in 1979, and because Merrey had been prompt in its payments since that time. However, Kline sold Merrey to Paolella in 1980 and thereafter Paolella made the payments. Kline had just bought Merrey back in December 1985, only weeks before the present credit problem arose. As a result, Lorillard's most recent experience with Kline had resulted in credit problems. Moreover, Kline's repurchase of Merrey occurred just before Paolella went into bankruptcy and caused a $700,000 loss to Lorillard. Also, Kline's new business was financed by MNIFC, the same lender which had foreclosed on Paolella. Kline's last minute pre-bankruptcy purchase of Merrey and the moving of sizable inventory from a Paolella warehouse in Philadelphia to his warehouse in Maryland caused Lorillard's credit antennae to twitch.

It is uncontradicted that plaintiff had little capital and was highly leveraged. There were no financial statements available except a pro forma which projected sales of $25 million per year with a $2.7 million profit. This is rather strange, and something that would catch the eye of a credit manager, particularly since Kline has insisted throughout these proceedings that he was greatly damaged by the temporary change in his credit arrangements because he operated on such a small profit margin. In 1979 Lorillard had put restrictions on credit terms with Merrey because of late payments, the deduction of discounts to which Merrey was not entitled, and disclaimers on its financial statement from Merrey's accountants. At the time of the January 31, 1986 $30,000 order, which plaintiff admits was a unusually large one, plaintiff still owed defendant $38,000 for past orders. Kline, although undercapitalized, was trying to expand as rapidly as possible by making large purchases on credit. The credit restriction at issue here, requiring cash payment, was promptly modified when a letter of credit supplied by MNIFC was posted.

Moreover, plaintiff has not shown that it was treated differently or that a discriminatory standard of credit worthiness was applied to it. Kline tries to compare itself with Park Jensen but this comparison does not show unjustified credit discrimination toward Kline. Park Jensen furnished an $80,000 letter of credit to Lorillard, $20,000 larger than that required of Kline. Park Jensen had not been a subsidiary of Paolella, which caused Lorillard a very sizable loss when it went into bankruptcy. Tobacco inventory had not been moved from a Paolella warehouse to a Park Jensen warehouse at the time of the Paolella bankruptcy.

It is not the intent of Robinson–Patman to create a situation in which a jury is the final arbiter of the reasonableness of credit decisions. We are not concerned with the reasonableness of such decisions, but we are concerned with whether there was unjustified discrimination in extending or withholding credit to competing purchasers. Credit decisions, by their very nature, require constant discrimination between those who are a good credit risk and those who are not. To avoid Robinson–Patman problems in the extension of credit, a manufacturer must use the same standard of credit worthiness in dealing with all applicants for credit who are in competition with one another.

In sum, the evidence presented by Kline, when considered without the testimony of its expert, which is dealt with in Section IV hereof, does not establish a Robinson–Patman violation.

### IV.

Lorillard claims that the trial court committed error in admitting the testimony of Kline's witness, Lilly Ann Gordon, the plaintiff's sole expert witness on the issue of whether Lorillard's shift in credit practices was an unjustified credit discrimination and price discrimination under § 13(a) of the Robinson–Patman Act.

Although the spirit of the Rules of Evidence is to eschew excessive restrictions on the admissibility of testimony, the plain language of the Rules maintains some limitations on expressions of opinion. Lay opinions must be "rationally based on the perception of the witness," Fed.R.Evid. 701, and, only experts qualified by "knowledge, skill, experience, training, or education" may submit an opinion. Fed.R. Evid. 702.

■ Rule 702 provides the starting point for an evaluation of whether Gordon's testimony was properly admitted. The Rule provides that a person qualified may give opinion testimony if such testimony will aid the fact-finder "to understand the evidence or to determine a fact in issue." It is well established that "the trial court has broad discretion in determining whether to admit expert testimony and should not be reversed absent a clear abuse of discretion." *Friendship Heights Associates v. Vlastimil Koubek*, 785 F.2d 1154, 1159 (4th Cir.1986). Generally, the test for exclusion is a strict one, and the purported expert must have neither satisfactory knowledge, skill, experience, training nor education on the issue for which the opinion is proffered. One knowledgeable about a particular subject need not be precisely informed about all details of the issues raised in order to offer an opinion. *Martin v. Fleissner GMBH*, 741 F.2d 61, 64 (4th Cir.1984).

■ It is under these standards that Gordon's qualifications and her opinions are evaluated. Gordon was, by her own admission, not an economist. Her highest level of education was a master's degree in business administration, obtained about seven years prior to this trial. During her entire career Gordon had published only one article, a piece which had nothing to do with price discrimination, credit, or antitrust generally. Her work experience was limited largely to analyses of companies' financial health. Gordon stated that her present employer devoted most of its efforts to providing expert testimony in trials of complex business cases. Gordon admitted that she had no personal experience in making credit decisions.

In her testimony, she compared the plaintiff's pro forma statement with an audited statement of Park Jensen Company, Inc., a Kline competitor of similar size. She gave no weight to the fact that Lorillard required Park Jensen to furnish an $80,000 letter of credit, but stated that requiring a $60,000 letter of credit from plaintiff was inconsistent and was evidence of credit discrimination by Lorillard. She also admitted that she was unfamiliar with personal guarantees of stockholders or officers and how they would influence credit decisions.

She gave no weight to the fact that plaintiff had just been a subsidiary of Paolella, which had just gone into bankruptcy, with substantial loss to defendant. Nor was she impressed by the transfer of part of Paolel-

la's tobacco inventory to plaintiff when Paolella went bankrupt, or by the fact that plaintiff had a very small capitalization and that there were no financial statements reflecting plaintiff's financial condition at the time defendant demanded cash.

Certainly no single one of these facts disqualifies Gordon from giving opinions about the legitimacy of the justifications for Lorillard's credit decisions. In combination, however, they lead us to the conclusion that this witness cannot satisfy even the minimal requirements of Fed.R.Evid. 702. There was no indication, for example, that Gordon's general business education included *any* training in the area of antitrust or credit. Similarly, Gordon admitted that she lacked *any* other experience in such matters. Although it would be incorrect to conclude that Gordon's occupation as a professional expert alone requires exclusion of her testimony, it would be absurd to conclude that one can become an expert simply by accumulating experience in testifying.

Plaintiff's expert admitted that she had no experience in making credit decisions, and her testimony confirms that she totally lacked the "knowledge, skill, experience, training, or education" that Rule 702 requires of an expert witness. Although a trial judge has considerable discretion in the admission of evidence, and particularly expert testimony, the admission of Ms. Gordon's testimony on the issue of credit decisions was a clear abuse of discretion. The witness did not possess "scientific, technical, or other specialized knowledge" that would assist the trier of fact, as required by Rule 702. This evidence should have been excluded, it was not merely to be accorded the reduced weight normally allowed less qualified testimony.

Since the breach of contract claim is barred by the Maryland Statute of Frauds and the plaintiff did not establish a jury issue on its Robinson–Patman claim, we need not address the defendant's additional exceptions.

REVERSED.

SPROUSE, Circuit Judge, dissenting:

I respectfully dissent. I believe that Kline's contract claim is not barred by Maryland's Statute of Frauds. Kline testified that, based on his experience in the industry and his prior dealings with Lorillard, the reference to "direct basis" in the letter to Kline from Lorillard meant he could purchase all his requirements from Lorillard on open credit terms. The jury apparently accepted this evidence and answered "Yes" to the interrogatory: "Has the plaintiff proved that the parties entered into a contract whereby the defendant promised to supply the plaintiff with its reasonable requirements on open credit terms?"

Accepting, as we must, Kline's testimony, Maryland's prerequisites for a requirements contract have been met. This is demonstrated by a fuller quotation from *Cavalier Mobile Homes v. Liberty Homes*, 53 Md.App. 379, 395, 454 A.2d 367, 377 (1983) in which the Maryland Court of Special Appeals indicated that the statute of frauds is satisfied "where the quantity term is not numerically stated, ... some writing ... indicates that the quantity to be delivered under the contract is a party's requirements." The jury, with a proper instruction and with the benefit of Kline's testimony about the language in the letter, specifically found that the letter expressed Lorillard's agreement to meet Kline's requirements. I agree, therefore, with the district court that there simply is no reason to disturb that jury finding.

With regard to Kline's Robinson–Patman claim, I believe that the principles concerning credit restrictions are controlled by *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 648, 100 S.Ct. 1925, 1928, 64 L.Ed.2d 580 (1980) (per curiam), in which the United States Supreme Court stated:

It is virtually self-evident that extending interest-free credit for a period of time is equivalent to giving a discount equal to the value of the use of the purchase price for that period of time. Thus, credit terms must be characterized as an inseparable part of the price.

The general application of this proposition is illustrated by the Court's application of

*Catalano* in the federal gift tax context in *Dickman v. Commissioner of Internal Revenue,* 465 U.S. 330, 337–38, 104 S.Ct. 1086, 1091, 79 L.Ed.2d 343 (1984). This principle, when applied to the present case, requires that the credit restrictions imposed by Lorillard on Kline be viewed as equivalent to it charging a higher price.

Finally, I disagree with the majority's assessment of the district court's admission of Lilly Ann Gordon's expert testimony on behalf of Kline. The evaluation made by the majority was more properly made by the district court.

Because I believe that the jury's calculation of damages on both the contract and Robinson–Patman claims was insufficiently supported by the evidence, I would remand for a new trial on contract damages and Robinson–Patman damages.