993 F.2d 1541
 62 Fair Empl.Prac.Cas. (BNA) 1896
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Ernest T. WRIGHT, Jr., Plaintiff-Appellant,
v.
Ronald H. BROWN, Secretary of Commerce, Defendant-Appellee.
 No. 92-1540.
 United States Court of Appeals,
Fourth Circuit.
 Argued: February 2, 1993
May 17, 1993
 
 Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Claude M. Hilton, District Judge. (CA-91-54-A)
 Argued: Alan Banov, Washington, D.C., for Appellant.
 Patricia Elaine Davison, Special Assistant United States Attorney, Alexandria, Virginia, for Appellee. On Brief: Richard Cullen, United States Attorney, Theresa Carroll Buchanan, Assistant United States Attorney, Alexandria, Virginia, for Appellee.
 E.D.Va.
 AFFIRMED.
 OPINION
 Before HALL, MURNAGHAN, and NIEMEYER, Circuit Judges.
 PER CURIAM:
 
 
 1
 Ernest T. Wright, Jr., filed suit in the Eastern District of Virginia alleging age discrimination and retaliatory discharge. Following a bench trial, the district court rejected Wright's claims. Wright appeals; we affirm.
 
 I.
 
 2
 Wright was employed as a patent examiner for the Patent and Trademark Office ["PTO"], Department of Commerce. His area of expertise was typewriter-related technology. Hired in 1960, he was discharged in 1990 at the age of fifty-eight.[1]
 
 
 3
 Everyone agrees that Wright's work was of a very high quality. By the time of his discharge, he had been promoted to the position of "Senior Examiner" and had received awards for superior performance in 1973 and 1979-81.
 
 
 4
 The problem, however, was Wright's history of vacillating levels of productivity-a serious problem, because a patent examiner's job performance is rated on the basis of both quality and productivity. In 1974, Wright was warned that he would not receive a"satisfactory" performance rating unless he raised his production. In 1984, Wright was warned that he would not receive his within-grade salary increase unless his productivity increased. In 1987, because of low productivity, Wright's performance was rated "marginal." In 1988, his work was rated "unsatisfactory," and he was warned that unless his productivity improved he would be removed from federal service. In 1989, because of low productivity, Wright was rated "unsatisfactory" and denied his within-grade pay increase. In 1990, after being informed that he would be removed from federal service because of his low productivity, Wright retired in order to protect his pension rights.
 
 
 5
 Wright then filed this suit alleging age discrimination and retaliatory discharge. Following a bench trial, the district court found that Wright had failed to demonstrate "that consideration of age played any part in his removal, and has presented no evidence that the reason for discharge was a mere pretext for retaliatory action." Wright v. Mosbacher, No. 91-0054-A (February 28, 1992, D.S.C.).
 
 
 6
 Wright then filed this appeal.
 
 II.
 
 7
 (Exclusion of Wright's expert witness)
 
 
 8
 Wright's first argument is that the district court abused its discretion by excluding the testimony of Norman Stack, an expert witness proffered to show that the PTO's system of judging patent examiners' productivity was inherently flawed and that the system had been applied in a discriminatory fashion against Wright. This ruling was predicated on the grounds of irrelevance, lack of qualifications, and a lack of helpfulness to the trier of fact.
 
 
 9
 We note that the standard of appellate review is deferential, as the "question of whether expert testimony is admissible is within the sound discretion of the trial judge, and appellate courts normally defer to the trial judge's decision." Persinger v. Norfolk & Western Ry. Co., 920 F.2d 1185, 1187 (4th Cir. 1990); Thomas J. Kline, Inc. v. Lorillard, Inc., 878 F.2d 791, 799 (4th Cir. 1989) (decision whether to admit expert testimony should not be reversed absent a clear abuse of discretion), cert. denied, 493 U.S. 1073 (1990).
 
 
 10
 We conclude that the district court did not abuse its discretion by determining that Stack's testimony would not have helped the "trier of fact to understand the evidence or to determine a fact in issue ... ". Fed. R. Evid. 702.
 
 
 11
 As an initial matter, we note that our review of Stack's written reports leads us to the same conclusion reached by the district court. The reports are highly partisan, written in bureaucratic doublespeak, and stray far from the issue at hand.[2]
 
 
 12
 We also note that the circumstances of this case make it less likely that the district court erred. This was a bench trial. Certainly, the district court was in the best position to determine what would, or would not, help it determine the issues in this case. Furthermore, Stack was clearly less qualified than the other witnesses presented by both parties in this litigation. Stack's highest level of employment was as a GS-12 (Wright was a GS-15-the highest level for a patent examiner), Stack had never been promoted to senior or primary examiner (Wright was a senior examiner), Stack had only performed a couple of patent searches in Wright's discipline, and, at the time of trial, Stack had not been employed as a patent examiner for ten years. Although Rule 702 does not require Stack to be "precisely informed about all details of the issue raised in order to offer an opinion," Thomas J. Kline, 878 F.2d at 799 (citations omitted), it also does not provide an open forum for expert testimony that will not assist the trier of fact. See Broadcort Capital Corp. v. Summa Medical Corp., 972 F.2d 1183, 1195 (10th Cir. 1992) (expert that is generally familiar in the field may still be unqualified to testify about a highly specialized area). Finally, Stack's testimony would have been cumulative.
 
 
 13
 Wright, who was far more qualified than Stack to speak on this subject, had already testified that he was assigned disproportionately difficult cases and that his supervisors had wrongfully refused to adjust his productivity requirements.
 
 
 14
 Therefore, under the circumstances of this case, we conclude that there was no abuse of discretion.
 
 III.
 
 15
 (Wright's age discrimination claim)
 
 
 16
 We now turn to the district court's ruling that Wright failed to establish a prima facie case of age discrimination.
 
 
 17
 A. Establishing a claim for age discrimination.
 
 
 18
 The Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 et seq., precludes most employers, including the federal government, from discriminating against employees on the basis of age. See 29 U.S.C. § 633a. The substantive elements of an ADEA claim are that
 
 
 19
 (1) an employee covered by the Act (2) has suffered an unfavorable employment action by an employer covered by the Act; (3) under circumstances in which the employee's age was a determining factor in the action in the sense that but for the employer's motive to discriminate against the employee because of the employee's age, the employee would not have suffered the action.
 
 
 20
 Tuck v. Henkel Corp., 973 F.2d 371, 374 (4th Cir. 1992) (citations omitted), cert. denied, 113 S.Ct. 1276 (1993); see also Conkwright v. Westinghouse Elec. Corp., 933 F.2d 231, 233 (4th Cir. 1991); Ballinger v. North Carolina Agric. Extension Service, 815 F.2d 1001, 1006 (4th Cir.), cert. denied, 484 U.S. 897 (1987).
 
 
 21
 There are two ways an employee can prove that age was a determining factor in the adverse employment decision: (1) under ordinary principles of proof using any direct or indirect evidence relevant to the issue; or (2) under the scheme of proof developed for Title VII cases in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and subsequently adopted for use in ADEA cases by this Circuit in Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 239 (4th Cir. 1982). See Tuck, 973 F.2d at 375.
 
 
 22
 In order to establish a prima facie case of age discrimination under the direct proof scheme, Wright was required to present either direct or circumstantial evidence that the PTO discharged him because of his age.
 
 
 23
 Under the McDonnell Douglas scheme, Wright was required to show that he (1) was over forty, (2) was discharged, (3) was performing his job at a level that met his employer's legitimate expectations, and (4) was replaced by someone of comparable qualifications outside the protected class. Tuck, 973 F.2d at 375.
 
 
 24
 If Wright had established a prima facie case, it would have created an inference of age discrimination, which the PTO could have rebutted by demonstrating a legitimate, non-discriminatory reasons for his discharge. Tuck, 973 F.2d at 375, relying on McDonnell Douglas, 411 U.S. at 802. If the PTO had rebutted Wright's inference of age-based discrimination by producing a legitimate reason for the discharge, Wright could still have prevailed by demonstrating that the proffered reason was pretextual.
 
 
 25
 The district court found that Wright "failed to show that consideration of age played any part in his removal[.]" Thus, Wright failed to establish a prima facie case under both the direct system of proof (he failed to prove he was discharged because of his age) and under the McDonnell Douglas system (he failed to establish that he was performing his job at a level that met his employer's legitimate expectations).
 
 
 26
 The standard of review for the district court's finding that age played no part in Wright's discharge is clear error. Lilly v. HarrisTeeter Supermarket (Lilly II), 842 F.2d 1496, 1505 (4th Cir. 1988).
 
 
 27
 B. Wright's disparate impact arguments.
 
 
 28
 We now review Wright's argument that the PTO's productivity system has a disparate impact on older examiners. First, he argues that the quota system discriminates against older employees because employees at a higher GS level are expected to produce more than employees at lower GS levels.[3] Second, Wright argues that "changes in technology have disproportionately disadvantaged the more senior examiners, since they generally examine the most complex patents."[4]
 
 
 29
 We disagree with the fundamental premise of Wright's first argument. The concept that a GS-15 examiner is expected to execute more difficult examinations and to be more productive than a GS-12 examiner strikes us as elemental.[5] Furthermore, accepting Wright's argument would require us to conflate merit-based job advancement and age discrimination. By way of analogy, Wright's claim could be extended to conclude that a law firm commits age discrimination by assigning complex cases to experienced partners rather than freshlyminted graduates. Undoubtedly, there would be a correlation between complexity of cases assigned and age. However, this correlation would not indicate discrimination.
 
 
 30
 Wright's second argument is similarly flawed because it ignores the PTO's use of "expectancy adjustments" to alleviate the reality that higher level GS examiners conduct more difficult examinations. Simply put, examiners who are consistently required to conduct complex searches are allowed a longer period of time in which to conduct their searches. Thus, Wright's supervisor was authorized to make substantial adjustments to Wright's expectancy based upon the complexity of his examinations, and in fact, such adjustments were made.
 
 
 31
 C. Was the PTO's productivity system fairly applied?
 
 
 32
 Wright's second argument is that the PTO's productivity system was applied in a discriminatory manner. The essence of this argument is that Wright's supervisor (Burr) failed to make a sufficient adjustment in Wright's expectancy based on the complexity of his examinations and the time he spent helping other examiners conduct their own searches.
 
 
 33
 We agree with the district court that there was no evidence that Burr's refusal to adjust Wright's expectancy was discriminatory. First, we note that Wright was allowed an average of 21.2 hours to complete each examination, the most of any GS-15 level examiner within his group. Although this fact alone does not prove that Wright's production expectancy was proper, it tends to show that Burr had made some accommodation for the complexity of Wright's examinations. Second, the district court made a factual finding that Wright's examinations were no more difficult than the examiner most similarly situated, who was accorded less time per examination than Wright. This factual finding was not clearly erroneous and, therefore, is binding upon this court. Anderson v. City of Bessemer City, 470 U.S. 564 (1985).
 
 
 34
 Finally, we address Wright's alleged "smoking gun." For years, Wright had complained that easier examinations were culled from the total pool and used to train new examiners. When Wright insisted that this distribution method be changed, his supervisor refused. One of the grounds given for the refusal was that Wright would "be eligible to retire in less than two years." Although Wright concludes that this remark is a per se indication that he was a victim of age discrimination, it is clear that he has taken the remark out of context. Wright's supervisor was merely pointing out that having a larger group of examiners working on each class of technology prevented temporary dislocations when individual examiners retired. Thus, on closer examination, Wright's smoking gun is not even smoldering.
 
 
 35
 In conclusion, we agree with the district court that Wright failed to establish a prima facie case of age discrimination.
 
 IV.
 
 36
 (Was the discharge a reprisal?)
 
 
 37
 During his tenure at the PTO, Wright filed six grievances concerning, among other things, disputes over his productivity requirements and alleged age discrimination. Wright also participated as a witness in another examiner's age discrimination suit. Wright asserts that his discharge was partially in retaliation for participating in these proceedings.
 
 
 38
 A claim for retaliatory discharge is also established using the McDonnell Douglas framework. See generally, Davis v. State University of New York, 802 F.2d 638, 642 (2d Cir. 1986). Wright established a prima facie case for retaliatory discharge: he engaged in protected activity, his employer was aware of the activity, Wright suffered adverse employment decisions, and the adverse actions closely followed the protected activity.
 
 
 39
 However, Wright's prima facie case was rebutted by the PTO's articulation of a legitimate, nondiscriminatory motive for the discharge: his low productivity. Thus, Wright's retaliatory discharge case fails unless he can demonstrate that the PTO's proffered explanation was pretextual.
 
 
 40
 We agree with the district court's finding that Wright failed to prove that the PTO's proffered reason was pretextual. Wright had repeatedly been warned about the potential consequences of his failure to meet production requirements. Wright continued to be plagued by low production and for this reason was discharged. There is no evidence that the PTO's proffered reason was a pretext, and, therefore, the district court's determination was not clearly erroneous.
 
 V.
 
 41
 For the aforementioned reasons, the decision of the district court is affirmed.
 
 AFFIRMED
 
 
 [1]
 Technically, Wright resigned. However, the parties stipulate that he was constructively discharged
 
 
 [2]
 For example, although Wright admits that "the question [in this case] was not whether the [PTO's] goals generally were 'right or wrong' ... but whether they were applied in a discriminatory fashion against appellant," Appellant's reply brief at p. 9, Stack's original written report is replete with assertions such as:
 The quota Mr. Wright is being measured against is a subsequent unilateral decision of the Agency to require a more rigid adherence to the quota figure without regard to the underlying lack of foundation for the figure. The employee union has consistently contested the Agency position.
 Therefore, in my opinion, the proper measure of Mr. Wright's work is not the quota as applied. It is an assigned quota understood as lacking a foundation. It should be understood as merely an indicator or [sic] the range of work that is acceptable and not a rigid figure.
 
 
 [3]
 The PTO measures examiner productivity by establishing individual "expectancies." The base expectancy is what the average GS-12 examiner produces. According to Wright, a GS-15 senior examiner with a master's level rating is expected to produce 140% more than the GS-12 examiner. Appellant's brief at p. 6
 
 
 [4]
 As of June 12, 1991, 20 of the 21 GS-15 examiners employed within Wright's "Class" were forty years of age or older
 
 
 [5]
 Presumably, this increased responsibility is the reason that the 1993 salary of a Step 1, GS-15 examiner is $66,609, whereas the salary of a Step 1, GS-12 examiner is $40,298