## A94A1612. EQUIFAX SERVICES, INC. v. EXAMINATION MANAGEMENT SERVICES, INC. et al.
### (453 SE2d 488)

SMITH, Judge.

Appellant Equifax Services, Inc. (Equifax) brought suit against competitor Examination Management Services, Inc. (EMSI) and former employee Edward A. Edge for claims related to the taking and misappropriation of certain lists of customers and "foreign correspondents" by former Equifax employees hired away by EMSI.[1] Count 1 alleged breach of contract by Edge of a nondisclosure agreement. Count 2 alleged that EMSI interfered with Equifax's contractual relations with Edge by encouraging him to breach the nondisclosure agreement. Count 3 asserted a claim for misappropriation of trade secrets. Count 4 alleged the common law tort of unfair competition. Count 5 alleged a conspiracy between EMSI and former employees of Equifax to misappropriate Equifax trade secrets. The trial court granted summary judgment to appellees on all counts. Equifax appeals the court's judgment as to all counts except the unfair competition claim.

Equifax is a provider of a variety of information products and services, including insurance claims investigations. Such investigations are handled on a national and international basis. In handling international claims investigations, Equifax utilizes third-party foreign investigators to assist them due to language, cultural, regulatory, and legal differences.

Equifax has developed and maintains a list of foreign investigators known as the "Equifax Foreign Correspondents List." The list contains the names, addresses, contact persons, telephone numbers, and fax numbers of Equifax foreign correspondents around the world.

---

[1] It is undisputed that such items have been destroyed or otherwise disposed of, and are no longer in EMSI's possession.

Equifax claims that the list was developed over the course of 50 years, that it gives Equifax a competitive advantage, that none of its competitors has a list of the same quality and depth, and that no competitor could establish by proper means even a substantial portion of the information contained on the correspondents list. Many correspondents on the list work exclusively for Equifax. Equifax further asserts that it has never freely distributed the correspondents list either within or outside the company; that while some of the information was shared with high-level executives of some of Equifax's clients, the list itself was never shown to any outside party, client or otherwise; and that within Equifax, the list has been treated confidentially and has been disseminated only to those who needed the information.

Equifax has also developed "customer lists." These exist in a variety of forms, including a computer database, microfiche records, and on employees' Rolodexes. Equifax claims that these lists contain actual and potential customers, are not generally known to the public, are not known to Equifax's competitors, are extremely valuable to Equifax, give Equifax a competitive advantage, are not readily ascertainable by any proper means, and would give competitors obtaining one a competitive advantage. Equifax asserts that its employees recognized the confidential nature of these lists, that they are "secret," and that Equifax has taken reasonable steps to preserve their secrecy.

In late 1985 and early 1986, Equifax instituted a program whereby all Equifax employees were required to sign a "confidentiality and assignment agreement" as a condition of future employment. Equifax maintains that all of its employees have been required to sign the agreement since the program began and that two employees who refused to sign the agreement were terminated in 1986. As examples of "confidential information," the agreement specifies, among other things, "customer lists" and "personnel lists."

In late 1992, EMSI initiated an effort to create a national and international insurance claims division to compete directly with Equifax. Toward that end, EMSI lured away several Equifax employees. Among them were high-level employees Sam Lawrence and appellee Edge. In the process of soliciting Lawrence and Edge, EMSI representatives made it clear that they were to take nothing with them from Equifax.

It is undisputed that after Lawrence retired from Equifax and began working for EMSI, Lawrence's Rolodex, a database residing on a computer Lawrence took with him to EMSI, and Equifax microfiche records containing a list of Equifax customers were used by Lawrence's secretary to create a computerized customer list that was then printed and sent to EMSI headquarters in Dallas, Texas, to be used in turn to create an initial mailing list.

It is likewise undisputed that when Edge left Equifax to work for

EMSI he took with him a copy of Equifax's "Foreign Correspondents List," that he created a condensed list for his own use from the Equifax list, and that he notified each correspondent on the condensed list of his move from Equifax to EMSI.

1. Equifax argues that its "confidentiality and assignment agreement" is enforceable, and therefore the trial court erred in granting summary judgment on its claims for breach of contract and tortious interference with contractual relations.

(a) As it applies to the nondisclosure provision, we disagree. The agreement provides, in pertinent part, as follows: "I will not release or disclose any . . . confidential information during the course of my employment with Equifax *or at any time thereafter.*" In *Thomas v. Best Mfg. Corp.*, 234 Ga. 787, 788 (1) (218 SE2d 68) (1975), the Supreme Court held: "To restrict an employee from utilizing the experience gained and using information *not designated as trade secrets* and attempting to extend the restriction beyond the employer's business in perpetuity to that of its clients, customers, consultants, licensees or affiliates without geographic restriction reaches beyond the scope permitted in Georgia in terms of time, territory, and activities protected. Although the employer is attempting to protect confidential information relating to his business, the restraint is so broad as to be unreasonable." (Emphasis supplied.)

Since the lists in dispute here are designated as "confidential information" rather than trade secrets under the contract, *Thomas* is applicable, and the contractual restraint is unenforceable. Equifax attempts to avoid this rule by relying on OCGA § 10-1-767 (b) (1), which in part provides that "a contractual duty to maintain a trade secret or limit use of a trade secret shall not be deemed void or unenforceable solely for lack of a durational or geographic limitation on the duty." This reliance is misplaced. Under the confidentiality agreement, " 'trade secret' information" is strictly limited to "the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, or improvement that is valuable and secret." Trade secrets as defined in the agreement are not at issue here. Moreover, this agreement does not merely fail to add a durational limitation to an otherwise enforceable agreement (compare *Howard Schultz &c. v. Broniec*, 239 Ga. 181, 187-188 (236 SE2d 265) (1977)); it affirmatively and unequivocally states that confidential information will not be disclosed by the employee "at any time" after his course of employment.

(b) However, this does not end the matter. The agreement also provides: "All information supplied to me by Equifax shall be used by me exclusively for the purpose of performing those services for which Equifax has agreed to employ me. Upon termination of the employment relationship regardless of cause, I will surrender to Equifax in

good condition any records or information provided to me by Equifax and will not keep any copies, summaries or photocopies thereof."

Such a clause has been upheld as a valid means of protecting documented confidential information of an employer even though the language used reflects no limits as to "time, territory or activity." *Nunn v. Orkin Exterminating Co.*, 256 Ga. 558, 560 (2) (350 SE2d 425) (1986). The "Foreign Correspondents List" retained by Edge was clearly "information provided to [him] by Equifax" that Edge covenanted to surrender to Equifax in good condition upon termination of his employment. Assuming Edge assented to this provision, he essentially acknowledged that he was not entitled to retain "copies, summaries or photocopies" of any information supplied to him by Equifax. Such a provision does not in any way prevent Edge from using the "aptitude, skill, dexterity, . . . mental ability, and such other subjective knowledge as he would have obtained while in the course of the employment," and it is therefore not invalid or unreasonable. *Nunn*, supra.

Equifax was unable to produce the agreement allegedly signed by Edge, and Edge acknowledges only that he "could have signed it but does not recall signing it." This merely raises an issue of fact as to whether Edge in fact executed the agreement. There is no dispute regarding the *contents* of such an agreement; appellees readily assert that Equifax "ask[ed] its 12,000 employees around the world to sign an *identical* form agreement." (Emphasis supplied.) It is solely the existence of an agreement between Equifax and Edge that is at issue.

In this regard, Equifax presented the affidavit of the former "Secretary to the Atlanta Regional Office," who stated that she verified the existence of Edge's confidentiality agreement in his personnel file in June 1992, and that the agreement remained in the file when she returned it to the proper filing cabinet. Appellees challenge this evidence solely because "no evidence was presented [as] to the contents of the agreement," despite their assertion that all such agreements are identical.

" 'While it is true that secondary evidence as to the contents of an alleged lost or destroyed (paper) should not be admitted until it is shown that a duly executed original once existed (cits.), yet "where no direct evidence of the execution of a written instrument is attainable, its execution may be proved by the circumstances." (Cit.)' [Cit.]" *Jefferson Pilot Fire &c. Co. v. Prickett*, 176 Ga. App. 810, 814 (338 SE2d 19) (1985). Also, " '[i]f the circumstances will justify a well grounded belief, that the original paper is kept back by design, no secondary evidence ought to be admitted; but when no such suspicion attaches, and the paper is of that description that no doubt can arise as to the proof of its contents, there can be no danger in admitting the secondary evidence.' " Id. at 813. See also OCGA § 24-5-21.

The transcript of the summary judgment hearing reveals the trial court was concerned that Equifax could not prove that Edge *himself* removed the agreement from his personnel file. However, in the absence of any suggestion that the contents of such an agreement might differ from that of agreements signed by other employees, it is irrelevant whether Edge or someone else might have removed the agreement. Equifax established a jury question with respect to whether Edge executed the confidentiality agreement allegedly required for his continued employment. The trial court therefore erred in granting summary judgment to Edge as applied to the provision requiring the return of documents.

(c) Equifax ostensibly combines its argument as to its enumerations based on breach of contract and tortious interference with contractual relations. However, regarding the latter issue, Equifax presents no argument other than to assert that reversal on the breach of contract claim against Edge mandates reversal on the claim against EMSI. This does not follow. Since no argument is presented, Equifax's separate enumeration is deemed abandoned. Court of Appeals Rule 15 (c) (2). However, we note that Equifax freely admits that EMSI representatives instructed Edge and Lawrence not to bring anything from Equifax with them when they started work for EMSI, and we are aware of no evidence contradicting that assertion. Our review of the record in addressing other enumerations has revealed no evidence upon which a claim for tortious interference with Equifax's contractual relations might be based.

2. Equifax's trade secret misappropriation claim is governed by the Georgia Trade Secrets Act of 1990 (GTSA), OCGA § 10-1-760 et seq. Under the Act, in its broadest sense, " '[t]rade secret' means information . . . which: (A) [d]erives economic value . . . from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; *and* (B) [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." (Emphasis supplied.) OCGA § 10-1-761 (4).

Equifax asserts it has taken "numerous steps" to maintain its trade secrets. However, a careful reading of Equifax's argument on appeal reveals that it is essentially relying on a single "step" — the fact that it required *each* of its thousands of employees to sign an *identical* "confidentiality and assignment" agreement in 1985 and 1986. Compare *Avnet, Inc. v. Wyle Labs.*, 263 Ga. 615 (437 SE2d 302) (1993) (nondisclosure agreements were required of "certain employees" to whom customer lists had been disclosed specifically to keep the information secret). The inquiry is therefore whether the single step taken by Equifax in 1985 and 1986 could alone be described as sufficient under the circumstances to establish, preserve, and main-

tain the "trade secret" status of the lists at issue under OCGA § 10-1-761 (4) (B) into the indefinite future.

We first note that Equifax specifically provided in the agreement that its customer and personnel lists are considered "confidential information," not trade secrets. Since an action for misappropriation of trade secrets is not dependent on the existence of a written contract, it would appear that it is the emphasis on the importance of secrecy in the agreement that is most relevant here, and not the characterization of the lists as something other than "trade secrets." See OCGA § 10-1-763 (c); *Thomas v. Best Mfg. Corp.*, supra. However, we cannot ignore the fact that the covenant to keep such information secret is overbroad, unenforceable as written, and was consented to by Edge (if at all) several years prior to the events at issue; nor can we ignore the fact that Equifax relies on the agreement exclusively to establish that reasonable steps were taken to maintain the secrecy it desires.

Equifax essentially takes the position that, based on the agreement alone, it can reasonably expect its exiting employees to take great pains to leave behind anything that might be reasonably covered under the confidentiality agreement. That the trial court found the quality of information at issue to be such that it "was publicly ascertainable without using misappropriation or other illegal means" reveals the inherent weakness of Equifax's position. Even with the confidentiality agreement fresh in mind, a self-interested employee may certainly be expected to reach a similar conclusion in the absence of further efforts by Equifax to clarify the matter.

We do not hold that requiring employees to sign confidentiality agreements alone is never sufficient to constitute a reasonable step to maintain the secrecy of information alleged to have been misappropriated. On the contrary, the formality involved in requiring an employee to sign a nondisclosure agreement designed to protect specific information may well be the only reasonable step that can be taken to document the employer's position and to serve as a caution against indiscretion. However, a finder of fact could not reasonably conclude that any lingering cautionary effect of the agreement relied upon by Equifax was *alone* sufficient to ensure nondisclosure of the information contained on the customer and correspondents lists. Under the circumstances presented, Equifax failed to take reasonable steps to enforce its confidentiality agreement and ensure the continuing secrecy of the information on the lists at issue. Therefore Equifax is not entitled to seek recovery under the specific provisions of the Trade Secrets Act.

3. Equifax claims error in the grant of summary judgment to appellees on its claim for conspiracy by EMSI and others to misappropriate trade secrets. This enumeration must fail for much the same reasons as noted in Division 1 (c). In support of this enumeration,

Equifax merely argues that misappropriation of trade secrets did occur, that the complaint alleges an actionable conspiracy, and that a corporation may be a party to such a conspiracy. Equifax fails even to suggest, however, that there is evidence giving rise to a material issue of fact on whether EMSI was actually involved in such a conspiracy. The evidence of record suggests only that EMSI was the unwitting beneficiary of the actions of former Equifax employees and that those actions were actively discouraged by EMSI. We find no error.

4. Nothing in this opinion is meant to imply that Equifax has no right of action against EMSI as a result of the alleged misappropriation by its employees of data contained on microfiche and in a computer database developed by Equifax. Although nonparty Lawrence suggests that he purchased these items when he purchased his office equipment at retirement, Equifax hotly disputes that claim. Whether customer information contained in archival or electronic formats developed by Equifax for internal use is available from other sources in the public domain is arguably irrelevant, since in any event the computer database and microfiche were clearly the *property* of Equifax if they were not actually sold to Lawrence upon his retirement.

The virtue of establishing that a purely intangible thing is a "trade secret" of an employer is that by doing so the employer establishes that the thing is its *property*. The motivation for doing so should be obvious. "A person who leaves the employment of another has a right to take with him all the skill he has acquired, all the *knowledge* he has obtained, and all the *information* that he has received, so long as nothing is taken that is *the property of the employer*. Trade secrets are *the property of the employer* and [like any property of the former employer] cannot be taken or used by the employee for his own benefit. . . ." (Emphasis in original; citation and punctuation omitted.) *Avnet, Inc. v. Wyle Labs.*, supra, 263 Ga. at 618 (2).

There is some authority for the proposition that non-specialized customer lists are not property under Georgia law and therefore an employer may not prevent an employee from using such a list in the absence of a contract. *Durham v. Stand-By Labor &c.*, 230 Ga. 558, 563 (2) (b) (198 SE2d 145) (1973);[2] *Contractors' Bldg. Supply v.*

---

[2] *Durham* cites *Taylor Freezer Sales Co. v. Sweden &c. Corp.*, 224 Ga. 160 (160 SE2d 356) (1968), as a case holding that customer lists are not property under Georgia law. However, the court in that case emphasized that " 'the petition does not allege that the defendant has a list of the plaintiff's customers which he procured while an employee and which he is using to the plaintiff's detriment, and [therefore] those cases holding such lists to be confidential information are not applicable here. . . .' " Id. at 165 (quoting *Vendo Co. v. Long*, 213 Ga 774, 778 (102 SE2d 173) (1958)). These cases appear to hold only that "equity will not enjoin the mere solicitation of business by a former employee." That is a question quite different from whether employers have property rights in their own customer lists such that

*Gwinnett Sash & Door*, 199 Ga. App. 38, 40 (2) (403 SE2d 844) (1991).[3] However, it does not follow that a rule of questionable origins should be extended to customer information that may be found on more sophisticated media such as an employer's microfiche or in its computer databases.

Once it is acknowledged that employees of EMSI have used Equifax's microfiche and computer database to create mailing lists (and assuming that those items were not sold to former employee Lawrence), the question whether EMSI could have used other means in the public domain to achieve the same end is relevant only to the extent to which EMSI has been unjustly enriched by its employees' misappropriation of the corporate assets of competitor Equifax.

It is difficult to ignore the extent to which a case for misappropriation of Equifax's property, though not properly characterized as trade secrets, has been established in the course of Equifax's attempt to prove the confidential character of the information contained on its proprietary computer database and microfiche. However, we likewise cannot ignore the fact that Equifax has litigated this action as if property rights in the items at issue exist if and only if they may be characterized as embodiments of certain Equifax trade secrets. Consequently, the trial court did not err in failing to consider sua sponte a misappropriation theory independent of the Georgia Trade Secrets Act as one that may be " 'fairly drawn from the pleadings and the evidence. . . .' " *Centennial Life v. Smith*, 210 Ga. App. 194 (435 SE2d 498) (1993).

*Judgment affirmed in part and reversed in part. Pope, C. J., and McMurray, P. J., concur.*

DECIDED DECEMBER 20, 1994 —
RECONSIDERATION DENIED JANUARY 11, 1995 — 

*Powell, Goldstein, Frazer & Murphy, James W. Hawkins, W.*

---

former employees are not entitled to possess and use them to their former employer's detriment. The Supreme Court has likewise interpreted *Taylor Freezer Sales* in a manner contrary to that attributed to the case in *Durham*, supra. See *Avnet, Inc. v. Wyle Labs.*, 263 Ga. at 619.

[3] *Contractors' Bldg. Supply* does not appear to be a case in which customer "lists" were at issue. Moreover, the case cites *Nager v. Lad 'n Dad Slacks*, 148 Ga. App. 401, 402 (1) (251 SE2d 330) (1978), as support for the proposition that "customer lists are not confidential information." However, *Nager* holds only that a former employee " 'may . . . go to customers whom he procured for the former employer and endeavor to persuade them to change their trade to his advantage. (Cit.)' [Cit.]" Id. *Nager* does not stand for the proposition that a former employee is entitled to use proprietary tools of the trade supplied to him by his former employer, and which he is obligated to return at the termination of his employment, as a means toward that end.

*Dennis McKinnie, Gil Y. Burstiner*, for appellant.

*Kirwan, Goger, Chesin & Parks, Robert B. Remar, Susan M. Garrett*, for appellees.