44088. ARCHITECTURAL MANUFACTURING COMPANY v. AIROTEC, INC. et al.

ARGUED JANUARY 8, 1969—DECIDED FEBRUARY 4, 1969— REHEARING DENIED FEBRUARY 28, 1969—

*Smith, Cohen, Ringel, Kohler, Martin & Lowe, John W. Chambers,* for appellant.

*Robert F. Lyle, Grant, Spears & Duckworth, William G. Grant,* for appellees.

DEEN, Judge. 1. Construing the evidence as we must against the motion for directed verdict the following must be considered. In the opinion of Biron, what Airolite wanted was an organization that could compete with its main competitor in the already established louver and manufacturing field, which competitor had an architectural specialties division, which Airolite lacked. In April before Scott and Biron left in May, Scott had a list for his use showing all job bids by AMCOA which totaled over $10,000. He admitted that such a list would contain information helpful to a competitor, and, although he denied having shown it to the Airolite people and stated that it was a routine list of a type prepared regularly in the course of business, no such list had recently been prepared at AMCOA prior to this one. Scott also had prepared a list of recently completed jobs showing customer, type of materials and amount, which was mailed to him in California immediately prior to his visit to the Airolite Ohio plant, and as to this he could not state definitely that it had not been shown to the Airolite people. During the two days immediately following their resignation, Scott and Biron called virtually all the sales representatives of AMCOA throughout the country to inform them of their resignation and that Airolite would either buy AMCOA or that they would start their own company. Within a week a number of the sales representatives' "at-will" contracts were canceled due to these calls. Sales representatives were informed that a majority of their number were canceling and coming with Airotec. Sixty-two of AMCOA's total of 65 sales representatives were contacted and a letter dated June 9 went out to them which stated in part: "Since sales policies, pricing and engineering designs were all originated by Doug [Biron] and myself in the parent company [AMCOA] you naturally can expect very little deviation in the new company. Doug and I

both appreciate the votes of confidence the vast majority of you have given us in deciding to go along in this new venture. . . We now have the opportunity to build an identical organization having had the experience of doing it once before. The backing of a bluechip arch. products firm and the sales organization that already knows the products—this combination has to be a winner." Of the 62 sales representatives contacted, 25 of the total new 28 unit sales force of Airotec terminated with AMCOA and signed on with Airolite during the following two months. In some cases the new firm placed bids on jobs on which Biron had immediately prior to leaving worked up preliminary specifications for AMCOA, but there was no proof that the availability of such information resulted in an unfair advantage to Airotec. Additionally, Scott and Biron contacted key personnel of AMCOA on behalf of the new organization, informing them that AMCOA was a sinking ship and wouldn't be in business long, and expressed the belief that they would obtain for Airotec the entire sales force except a few that he did not want to contact. These sales representatives obtained job information and handled the bids of the plaintiff corporation, and were in effect its livelihood.

"The fact that an employment is at the will of the employer and employee does not make it one at the will of others, and a malicious and wrongful interference with such employment by another is actionable although the employment be at will." *Ott v. Gandy,* 66 Ga. App. 684 (1) (19 SE2d 180); *Code* § 105-1207. The same situation exists where the at-will relationship is not techincally one of master and servant but of a manufacturer or distributor and sales representative who are in fact independent contractors, if the interference with the employment is wrongful and malicious, as by persuading practically the entire sales force of the plaintiff, upon which it depends for its livelihood, to leave the plaintiff en masse and join a competing firm. Wear-ever Aluminum v. Townecraft Industries, 75 N. J. Super. 135 (182 A2d 387); Falstaff Brewing Corp. v. Iowa Fruit &c. Co., 112 F2d 101; A. S. Rampell, Inc. v. Hyster Co., 1 Misc. 2d 188 (148 NYS2d 102). In Wearever Aluminum it was held, quoting Louis Kamm, Inc. v.

Flink, 113 N. J. L. 582, 587 (175 A 62, 99 ALR 1): " 'Merely to persuade a person to break his contract may not be wrongful in law or fact. . . But if the persuasion be used for the indirect purpose of injuring the plaintiff, or of benefiting the defendant at the expense of the plaintiff, it is a malicious act . . . and . . . an actionable act if injury ensues from it.' " P. 141. It was recognized in that case, as in *Vendo Co. v. Long,* 213 Ga. 774 (102 SE2d 173) and *Taylor Freezer &c. Co. v. Sweden Freezer &c. Corp.,* 224 Ga. 160 (160 SE2d 356) that fair competition is alway legal, that an employee after leaving his employment may, so long as he does not use the other man's trade secrets, avail himself of whatever expertise he has acquired from his former employer, may compete for the same customer dollar, and may even go to customers whom he procured for the former employer and endeavor to persuade them to change their trade to his advantage. See also *Stein v. National Life Assn.,* 105 Ga. 821 (32 SE 615, 46 LRA 150). The problem here is not procuring customers per se (since customers come not from repeat business but from building in the area) but rather procuring the sales representatives trained by the plaintiff, listed in its catalogues, and on whom it depends for leads and contacts so that it may bid on and procure jobs. Again, as held in the Wear-ever case, 75 N. J. Super. 135, 143, supra, under similar circumstances: "The weakness of the defendant's argument concerning its so-called privilege arising from competition becomes apparent upon an investigation of the individuals for whom the plaintiff and defendant compete. It is uncontroverted that both compete for the same customer dollar. Both also compete for salesmen or distributors. The difference between the companies lies in the source of this competition. While the plaintiff does compete with the defendant for distributors from a general market of men in other jobs, it does not compete with the defendant in the recruitment of distributors from competitors in the trade. Expressed differently, the plaintiff does not engage in a planned campaign of mass recruiting from its competitors; Townecraft does." Here there was evidence of a concerted attempt immediately after the resignation of Scott and Biron to persuade

substantially the entire sales force of AMCOA to join Airotec, that this was successful as to over 1/3 of the force, and that it resulted in certain special damages such as rendering ineffective the mailings and catalog listings of the plaintiff which were its primary means of identifying and presenting its sales force to the trade generally. In addition, regular employees of AMCOA were informed that AMCOA was financially unsound, a sinking ship, would soon go out of business, and that it was to their advantage therefore to come with the new firm. The good faith and truthfulness of these statements is a legitimate subject for jury inquiry. And, thirdly, there was sufficient evidence regarding the two lists prepared and received by Scott immediately prior to his decisive interview with Airolite Co. to allow jury consideration of whether pre-knowledge of AMCOA's bidding practices was used to its detriment by the defendant corporation, particularly in a few instances of bids not closed where Airotec immediately thereafter submitted competing bids. See Morgan's Home Equip. Corp. v. Martucci, 390 Pa. 618 (136 A2d 838).

2. Unless, however, the defendants acted "maliciously" in these matters the direction of a verdict in their favor is proper. The word itself is frequently criticized for lack of precision, since it can mean anything from the primary intention to harm another to mere intention to do an act by one who, from knowledge of the interests of another, knows this will interfere with them. "An examination of the authorities . . . will show that the term 'malicious' or 'maliciously' means any unauthorized interference, or any interference without justification or excuse." *Luke v. DuPree,* 158 Ga. 590, 596 (124 SE 13). "The term 'malicious,' used in this connection is to be given a liberal meaning. The act is malicious when the thing done is with the knowledge of the plaintiff's rights, and with the intent to interfere therewith." *Employing Printers Club v. Doctor Blosser Co.,* 122 Ga. 509, 519 (50 SE 353, 69 LRA 90, 106 ASR 137, 2 AC 694). This right must be balanced against the privilege of the defendants to terminate their at-will employment, to engage in direct competition, to hire others who formerly worked for the employer, even to persuade them that

their company offers better economic opportunity, so long as they interfere with no contractual rights. It is apparent, however, that the general thrust of the cases relating to injury to business is that, while even the destruction of a competing business by means of attracting its customers in the fair course of trade is not actionable, destruction or substantial injury by means of attracting away all or a large percentage of personnel upon whom it must depend to function, especially if other circumstances such as the use of confidential information or misrepresentations as to the plaintiff's financial solvency are involved, is compensable, with lack of actual malice going merely to mitigation of damages.

*Judgment reversed. Bell, P. J., and Eberhardt, J., concur.*