**AMERiGAS PROPANE, L.P., Plaintiff,**

v.

**T-BO PROPANE, INC.; Sue H. Tebeau; Larry R. Turner; and Lloyd Moore, Jr., Defendants.**

**Civil Action No. CV496–171.**

United States District Court, S.D. Georgia, Savannah Division.

Aug. 20, 1997.

---

Morton G. Forbes, John Foster, Forbes & Bowman, Savannah, GA, for Plaintiff.

R. Daniel Price, Dennis G. Dozier, Sr., Thompson, Price & Dozier, Rincon, GA, for Defendants.

## ORDER

MOORE, District Judge.

Plaintiff, in the above-captioned case, has sued Defendants, asserting that they have violated various non-competition and non-disclosure covenants agreed to among the parties. Defendants have filed a Motion for Summary Judgment while Plaintiff has filed a Motion for Partial Summary Judgment. For the reasons and to the extent stated below, Defendants' motion is **GRANTED IN PART** and **DENIED IN PART** and Plaintiff's motion is **DENIED.**

## BACKGROUND

Unless otherwise indicated by commentary or specific citation to evidence, the following facts are not in dispute.

AmeriGas came into the Effingham area approximately four years ago by acquiring a company called Petrolane which had earlier acquired a company called Coastal Gas; currently, including Defendant T–Bo Propane, there are six propane gas dealers in the Effingham area—the largest being Shepard Brothers. Defendant Susan Tebeau's father had been the principal of Coastal Gas and she worked in various capacities with that company and its successors until she became the District Manager for Plaintiff, overseeing the Effingham branch of operations. Defendant Larry Turner, a service representative and truck driver, and Defendant Lloyd

Moore, a sales representative and truck driver, were also absorbed as employees by Plaintiff upon its acquisition of Petrolane. In October 1995, Plaintiff, a national company, restructured its internal operations. As a result of this restructuring, Defendant Tebeau was essentially demoted to Customer Service Manager in or around April 1996. On April 9, 1996, Defendant Tebeau quit her employment with Plaintiff, as communicated through a resignation letter. Defendant Moore resigned on April 26, 1996, and Defendant Turner resigned on May 20, 1996. Though T–Bo Propane is owned and operated by Billy Tebeau, Mr. Tebeau's wife, Defendant Susan Tebeau, played an active role in establishing T–Bo Propane, certifying the company's safety record, and marketing the company's services. Defendant Tebeau maintains that she is not paid by the new company, she has no ownership interest, and merely works as an informal adviser. Defendants Moore and Turner are officially employed by Defendant T–Bo Propane.

Defendants Tebeau, Moore, and Turner, had all signed certain boilerplate covenants with Plaintiff throughout their employment with that corporation. The relevant covenants provide:

1. **Confidential Information and Company Property**

a. During my employment, the Company will put me in a position of trust and confidence by disclosing to me "Confidential Information" about its business and its customers. "Confidential Information" includes, for example, information concerning business and marketing plans; past, present and prospective customer identities, lists, and credit information; pricing and marketing policies and practices; gas usage patterns; financial information; and other operating policies and practices. I will protect the Company's confidential information from disclosure and will not divulge it to any other person or entity during or after the term of my employment.

b. Confidential information as well as reports, manuals, memoranda and other materials used by me during the performance of my duties belong to the Company and will be used by me exclusively for the Company's benefit. I will return all such property including copies to the Company at the termination of my employment.

2. **Prohibited Activities**

Following the termination of my employment with the Company for any reason:

a. I will not, directly or indirectly, solicit the liquefied petroleum gas ("LP–Gas") business of any "Customer" of the Company (i) for a period of two (2) years following the termination of my employment, and (ii) in a fifty (50) mile radius of any office or plant where I worked within the two (2) years prior to the termination of my employment.

b. I will not directly or indirectly service or sell LP–Gas or any related appliances, equipment or services to any "Customer" of the Company, (i) for a period of two (2) years following the termination of my employment and (ii) in a fifty (50) mile radius of any office or plant where I worked within the two (2) years prior to the termination of my employment. For purposes of Subsection 2a and 2b, a "Customer" of the Company includes any person or entity which purchased LP–Gas or related appliances, equipment, or services of the Company at any time within one (1) year prior to the termination of my employment or which during a period of six (6) months prior to the termination of my employment had been solicited by the Company or received a proposal from the Company to supply it with LP–Gas or related appliances, equipment or services.

c. For a period of two (2) years after the termination of my employment I will not, nor will I induce any other person or entity to, employ or offer employment in an LP–Gas related business to any employee of the Company with whom I worked during the two (2) years prior to the termination of my employment. Furthermore, I shall not induce any such employee to terminate his or her employment with the Company.

The agreements also include a non-waiver provision as well as a severability provision which states: "If any provision of this Agreement or its application to any person or any circumstance shall be determined to be invalid or unenforceable to any extent, then the remainder of the Agreement and the application of such a provision either to other persons or in different circumstances shall not be affected and shall be enforceable to the fullest extent permitted by law." These agreements were signed by Defendant Tebeau on March 14, 1994, Defendant Turner on February 22, 1994, and Defendant Moore on January 17, 1996.

Plaintiff maintains a file on each of its customers; each file generally includes address information, usage history, the pricing policy applicable to the customer, the customer's credit history, and other information used for marketing purposes. All three individual Defendants had open access to these files during their employment tenure with Plaintiff. Plaintiff does not contend that any of the individual Defendants removed any copies of information contained in the customer files from the AmeriGas office. (Testimony of David MacBride, Trans. of August 6, 1996, Prelim. Inj. Hrg., p. 31.)

Prior to terminating its relationship with Plaintiff, Lovette Lumber was one of the largest, if not the largest, customer of Plaintiff in the Effingham district. Situated in Rincon, Georgia, Lovette Lumber is a reseller of propane. In other words, it buys great quantities of the gas and then resells it to individuals through a dispensing tank. The dispensing tank had the term "AmeriGas" on the side and was clearly visible from the roadway. In the preliminary injunction hearing, Wendell Lovette testified that he had dealings with Plaintiff for several years but that Defendant Moore asked him whether he would be interested in switching his business to a company soon to be organized called T–Bo Propane. Defendant Moore was working for Plaintiff at the time. As a result of the solicitation, Lovette Lumber now buys its propane from Defendant T–Bo Propane. Plaintiff claims that Defendant Moore solicited the business at the direction of Mr. Tebeau; Defendants dispute this assertion.

Whether or not he did so at Mr. Tebeau's direction, it is abundantly clear that Defendant Moore solicited Lovette Lumber while working for Plaintiff.

Linda Edwards is the proprietor of Mac's Country Store in Guyton, Georgia. Mac's Country Store, like Lovette Lumber, is a reseller of propane and was a large volume customer of Plaintiff's. The store also had a large dispensing tank with the "AmeriGas" logo visible from the roadway. As with Lovette Lumber, Defendant Moore, while working for Plaintiff, solicited Ms. Edwards to switch to Defendant T–Bo Propane and offered prices cheaper than Plaintiff's. The store switched accounts and is now a T–Bo Propane customer.

Defendant Moore also solicited on behalf of Defendant T–Bo Propane the following customers who switched from Plaintiff to Defendant T–Bo Propane: Robert Kennedy; Mildred Hall; Duane Hall; Linda Tillman; Christine Johnson; Betty Brown; Juanita Haggary; and J.W. Williams. The solicitations of these individuals as well as of the two stores were made by Defendant Moore during a period when he was supposed to be working for Plaintiff. During her employment with Plaintiff, Defendant Susan Tebeau knew of Defendant Moore's solicitations but did nothing to stop him.

It is not contested that Defendant Tebeau had access to customer information while working for Plaintiff and that she solicited customers of Plaintiff for her husband's new company after she left Plaintiff. At the preliminary injunction hearing, she testified that she is involved in "everything in general" with Defendant T–Bo Propane and that it was she who drafted the letter used in a direct mail marketing campaign launched by the new company. Furthermore, she acknowledged that, after leaving AmeriGas, she came into possession of a customer list from Plaintiff, knew that she should not use it for Defendant T–Bo Propane's advantage, but used it anyway to solicit approximately fifty customers. Defendants contend that Beatrice Watts, an employee of Plaintiff's, was planning on leaving Plaintiff and going to work for T–Bo Propane and that she gratuitously brought the customer list to T–Bo

690

Propane's office. (*See* Susan Tebeau Test., Prelim. Inj. Hrg. Trans., pp. 103–04.) The veracity of this assertion is contested by Ms. Watts; Plaintiff claims that Defendants solicited Ms. Watts to quit working for Plaintiff and to begin working for T–Bo Propane but that she did not provide them with any customer list. (December 5, 1996, Depo. of Beatrice Watts, pp. 10–11, 6–8.) It is undisputed that the only information contained on the customer lists is the names, street addresses and post office boxes, and telephone numbers of several hundred AmeriGas customers. (Defs.' Supp. Stmt. of Facts, ¶ 11; Dec. 5, 1996, Depo. of David G. MacBride, Ex. 1.) It is also undisputed that Defendants Tebeau, Turner, and Moore retained personal knowledge of information concerning Plaintiff's customers; this knowledge included customers' buying habits, credit standing, pricing arrangements, and consumption needs. (Defs.' L.R. 56 Stmt., ¶ 6.)

On July 18, 1996, Plaintiff filed its Verified Complaint through which it set forth several legal theories under which Plaintiff elected to proceed: Breach of Covenant Not to Compete (Count One); Tortious Interference with Contractual Relations and Tortious Interference with Business Relations/Prospective Advantages (Count Two), and; Violation of Georgia Trade Secrets Act of 1990, O.C.G.A. § 10–1–760 *et seq.* (Count Three). Count Four asserted a request for preliminary and permanent injunctive relief.

On August 6, 1996, this Court conducted a hearing to determine whether any preliminary injunction should be issued and, if so, what the scope of that injunction should be. As a result of the hearing, this Court issued an Order on September 11 temporarily enjoining Defendants from providing service to any former AmeriGas customer solicited by Defendants in the direct mail marketing campaign. The Court also ordered Defendants to immediately return any confidential information, including but not limited to customer lists, taken or received from Plaintiff. Finding that Plaintiff had failed to demonstrate a likelihood of success on the merits, the Court refused to grant any injunctive relief as to the non-compete covenants of the subject employment agreements. Plaintiff

was ordered to post a $35,000 bond; Plaintiff complied and the injunction was effectuated on September 23.

On January 6, 1997, Plaintiff filed its Motion for Partial Summary Judgment and Defendants filed their Motion for Summary Judgment. Each side has filed responses to their opponents' motions. This Court now considers the motions.

## ANALYSIS

### I. *When summary judgment is appropriate.*

The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp., v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The burden then shifts to the nonmovant to establish, by going beyond the pleadings, that there is a genuine issue as to facts material to the nonmovant's case. *Thompson v. Metropolitan Multi–List, Inc.,* 934 F.2d 1566, 1583 n. 16 (11th Cir.1991). A dispute of material fact "is 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, [then] there is no genuine issue for trial." *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356.

In assessing whether the movant is entitled to summary judgment in its favor, the district court must review the evidence and reasonable factual inferences arising from it in the light most favorable to the nonmoving party. *Welch v. Celotex Corp.,* 951 F.2d

1235, 1237 (11th Cir.1992). This Court must avoid weighing conflicting evidence during this endeavor. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14. Where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the court should refuse to grant summary judgment." *Barfield v. Brierton,* 883 F.2d 923, 933–34 (11th Cir.1989) (citation omitted). However, if the evidence is merely colorable or not significantly probative, summary judgment may be granted. *Id.*

## II. Count One: The restrictive covenants are void.

### A. The non-competition covenants are invalid and unenforceable.

■ This Court has reviewed the non-competition covenants agreed to by the individual Defendants and concludes that, as a matter of law, the covenants are invalid and unenforceable. The Georgia courts have clearly stated the approach courts are to take when deciding whether to enforce non-competition agreements:

> Even though contracts generally restraining trade or tending to lessen competition are against public policy and void under Ga. Const. 1983, Art III, Sec. VI, Par. V(c), and O.C.G.A. § 13–8–2, restrictive covenants in employment contracts are deemed only in partial restraint of trade and will be upheld if they are reasonable, founded on a valuable consideration, and reasonably necessary to the protected interest, but do not unduly prejudice the public interest. Further, this determination is a question of law for the court, which must consider the nature and extent of the trade or business, the situation of the parties, and any other relevant circumstances. A three-element test of duration, territorial coverage, and scope of activity is used in examining the reasonableness of the restrictions.

*American Gen'l Life Accident Ins. Co. v. Fisher,* 208 Ga.App. 282, 283, 430 S.E.2d 166 (1993) (citing *W.R. Grace & Co. v. Mouyal,* 262 Ga. 464, 465, 422 S.E.2d 529 (1992)); *see also Orkin Exterminating Co., v. Walker,* 251 Ga. 536, 537, 307 S.E.2d 914 (1983);

*Rollins Protective Services Co. v. Palermo,* 249 Ga. 138, 287 S.E.2d 546 (1982).

■ Of primary concern to this Court is Subsection 2b of the agreements signed by Defendants which prohibits them from servicing or accepting business from any customer of Plaintiff, regardless of whether that customer came to Defendants without their active solicitation. There is ample Georgia caselaw which states that contractual prohibitions against doing business with any former client of the signatory company, regardless of the employee's relationship with that client, is overbroad and unenforceable. *Orkin Exterminating,* 251 Ga. at 538–39, 307 S.E.2d 914; *Singer v. Habif, Arogeti & Wynne, P.C.,* 250 Ga. 376, 377, 297 S.E.2d 473 (1982); *Vortex Protective Service, Inc. v. Dempsey,* 218 Ga.App. 763, 766, 463 S.E.2d 67 (1995); *Dougherty, McKinnon & Luby, P.C. v. Greenwald, Denzik & Davis, P.C.,* 213 Ga.App. 891, 894, 447 S.E.2d 94 (1994).

The Georgia courts have routinely held that a "no acceptance" provision, such as that contained here at Subsection 2b, "prohibits more than the active solicitation or diversion of clients, and constitutes an unreasonable restraint of trade as it overprotects [the movant's] interests and unreasonably impacts on [the former employee] and on the public's ability to choose the ... services it prefers." *Singer,* 250 Ga. at 377, 297 S.E.2d 473; *see also Orkin Exterminating,* 251 Ga. at 538–39, 307 S.E.2d 914 (expanding Georgia Supreme Court's disapproval of "no acceptance" covenant to include non-professional service industry). As a result, this type of provision is almost universally disparaged by the appellate courts of Georgia. *See Vortex Protective,* 218 Ga.App. at 766–67, 463 S.E.2d 67.

■ Therefore, this Court can only conclude that, as a matter of law, Subsection 2b of the employment agreements is invalid and unenforceable. That, then, begs the question: what of the other non-competition provisions? This is a valid question for, after all, the subject agreements each contain a severability provision. Georgia courts, however, do not "blue pencil" non-competition agreements; in other words, if *one* non-competition covenant is unenforceable then they

are *all* unenforceable. *White v. Fletcher/Mayo/Associates. Inc.,* 251 Ga. 203, 204, 303 S.E.2d 746 (1983); *Rita Personnel Services Int'l, Inc. v. Kot,* 229 Ga. 314, 317, 191 S.E.2d 79 (1972). The *Rita Personnel* court reached this conclusion as a simple matter of public policy which is worthy of lengthy quotation:

> Now, if the covenant as read in its entirety is unenforceable, should we adopt the "Blue-pencil theory of severability", sever that part of the covenant which makes the entire covenant unenforceable, and then hold that what remains after severance is enforceable?
>
> We have give careful consideration to the severance theory, and we decline to apply it.
>
> Professor Harlan M. Blake in 73 Harv. L.Rev. 625 (February 1960) had this to say: "Courts and writers have engaged in hot debate over whether severance should ever be applied to an employee restraint. The argument against doing so is persuasive. For every covenant that finds its way to court, there are thousands which exercise an *in terrorem* effect of employees who respect their contractual obligation and on competitors who fear legal complications if they employ a covenantor, or who are anxious to maintain gentlemanly relations with their competitors. Thus, the mobility of untold numbers of employees is restricted by the intimidation of restrictions whose severity no court would sanction. If severance is generally applied, employers can fashion truly ominous covenants with confidence that they will be pared down and enforced when the facts of a particular case are not unreasonable. This smacks of having one employee's cake, and eating it too."
>
> There are some good reasons in support of the doctrine of severance. However, we conclude that those reasons are not of sufficient weight to offset those reasons for refusing to apply the doctrine. In short, we have weighed the "blue pencil" doctrine in the balance, and found it wanting.

229 Ga. at 317–18, 191 S.E.2d 79.

Because of this unequivocal statement of law, the Court must determine which provisions are affected by the anti-blue pencil stance of the Georgia courts. This Court finds that Subsections 2a, 2b, and 2c, are all non-competition covenants. As such, they are all affected by this stance and are unenforceable. *Id.*

**B. *Non-disclosure covenants are invalid and unenforceable.***

█ This Court now turns to the non-disclosure covenants contained in Subsections 1a and 1b of the employment agreements. The Georgia courts, despite their strong position against blue pencilling, conclude that non-disclosure covenants are legally separate from the non-competition covenants and, therefore, are not affected by a court's determination of a non-competition covenant's unenforceable nature: "It should be noted ... that a claim for breach of covenant not to compete and one for wrongful disclosure and use of confidential information in violation of contract may be maintained separately and independently under the same or distinct provisions of the employment agreement." *Durham v. Stand–By Labor of Georgia, Inc.,* 230 Ga. 558, 562–63, 198 S.E.2d 145 (1973). As the Georgia Court of Appeals observed, "[S]pecific 'noncompetition' prohibitions concerning employment and customer solicitation must be analyzed separately from those concerning disclosure of confidential business information ..." *Sunstates Refrigerated Services, Inc. v. Griffin,* 215 Ga.App. 61, 62, 449 S.E.2d 858 (1994) (citing *Wiley v. Royal Cup,* 258 Ga. 357, 359–60, 370 S.E.2d 744 (1988); *Lane Co. v. Taylor,* 174 Ga.App. 356, 330 S.E.2d 112 (1985)).

██ This Court now must analyze the reasonableness of the covenants contained in subsections 1a and 1b of the agreements. In determining the enforceability of specific nondisclosure clauses, courts must be satisfied with the reasonableness of the clauses. *Stahl Headers v. MacDonald,* 214 Ga.App. 323, 324, 447 S.E.2d 320 (1994). "Unlike general non-competition provisions[,] specific nondisclosure clauses bear no relation to territorial limitations and their reasonableness turns on factors of time and the nature of the business interest sought to be protected." *Id.* (internal quotes and citations omitted).

For this analysis, both sides seem to agree that *Equifax Svcs., Inc. v. Examination Mat. Svcs., Inc.*, 216 Ga.App. 35, 453 S.E.2d 488 (1995), is the controlling authority. In *Equifax*, the Georgia Court of Appeals considered a claim for breach of a nondisclosure covenant. *Id.* In that case, the plaintiff (an insurance investigation firm) had developed and maintained a list of foreign investigators which contained "the names, addresses, contact persons, telephone numbers, and fax numbers of Equifax foreign correspondents around the world." *Id.* The plaintiff also had developed customers' lists in a "variety of forms, including a computer database, microfiche records, and on employees' Rolodexes." *Id.* at 36, 453 S.E.2d 488. The plaintiff required all of its employees to sign confidentiality agreements as conditions of future employment. *Id.* In signing these agreements, the employees ostensibly agreed to not disclose any " 'confidential information' " from " 'customer lists' " and " 'personnel lists.' "[1] *Id.*

Two employees left the plaintiff and began to work for the defendant. *Id.* One employee took a copy of the "foreign correspondents lists" while the other employee took computer and microfiche records containing lists of plaintiff's customers which the employee then used for the purpose of creating an initial mailing list. *Id.* The trial court granted the defendant's motion for summary judgment on the breach of covenant claim and the plaintiff appealed. *Id.* at 35, 453 S.E.2d 488. The *Equifax* court held that the trial court had properly granted the summary judgment motion as to the first portion of the nondisclosure agreement laid out in footnote 1, *supra.* In so ruling, the Court reasoned:

> In *Thomas v. Best Mfg. Corp.*, 234 Ga. 787, 788, 218 S.E.2d 68 (1975), the Supreme Court held: "To restrict an employee from utilizing the experience gained and using information *not designated as trade secrets*

and attempting to extend the restriction beyond the employer's business in perpetuity to that of its clients, customers, consultants, licensees or affiliates without geographic restriction reaches beyond the scope permitted in Georgia in terms of time, territory, and activities protected. Although the employer is attempting to protect confidential information relating to his business, the restraint is so broad as to be unreasonable."

> Since the lists in dispute here are designated as "confidential information" rather than trade secrets under the contract, *Thomas* is applicable, and the contractual restraint is unenforceable.

*Id.* at 37, 453 S.E.2d 488 (emphasis added by *Equifax* court).

In this case, the non-disclosure covenant incorporated at subsection 1a parallels that which the *Equifax* declared unenforceable. Because the subsection 1a restriction contains no durational limitation, this Court must follow the black letter and find that it is unenforceable. *Id.; see also Stahl Headers*, 214 Ga.App. at 324, 447 S.E.2d 320; *Howard Schultz & Assocs. v. Broniec*, 239 Ga. 181, 188, 236 S.E.2d 265 (1977). *Cf. U3S Corp. of America v. Parker*, 202 Ga.App. 374, 376–77, 414 S.E.2d 513 (1991) (finding that nondisclosure agreement with two-year time limit was valid and enforceable).

The restrictive covenant found at subsection 1b, however, presents a slightly different issue. In *Equifax*, the court upheld the enforceability of the remainder of the covenant discussed in footnote 1, *supra*, despite the fact that there was no time limit incorporated into the covenant. 216 Ga.App. at 36–37, 453 S.E.2d 488. Reading between the lines of the sparsely written opinion, the Court believes that the *Equifax* court declined to invalidate the covenant because it saw that the covenant sought to protect property rights in tangible company assets as opposed

---

1. The confidentiality agreements stated in relevant part:

 "I will not release or disclose any ... confidential information during the course of employment with Equifax *or at any time thereafter.* All information supplied to me by Equifax shall be used by me exclusively for the purpose of performing those services for which Equifax

has agreed to employee me. Upon termination of the employment relationship regardless of cause, I will surrender to Equifax in good conditions any records of information provided to me by Equifax and will not keep any copies, summaries or photocopies thereof."

*Equifax*, 216 Ga.App. at 37–38, 453 S.E.2d 488 (emphasis in original).

to protecting from dissemination knowledge gained during the employee's course of employment. *See id.* at 38, 453 S.E.2d 488 (contrasting employer's ability to restrict retention of physical documents as opposed to employer's ability to restrict dissemination of personal knowledge). Upon initial application, the *Equifax* precedent seemingly protects the subsection 1b covenant; further review, however, shows that this is not the case.

This Court cannot allow Plaintiff to claim the protection of subsection 1b. The problem the Court has with subsection 1b is that it protects "[c]onfidential information as well as reports, manuals, memoranda and other materials." As defined in subsection 1a, "confidential information" would include Defendants' subjective knowledge as well as tangible lists, etc. In effect, Plaintiff is trying to get in through the back door what the Court has already ruled it will not let in through the front door. Because it had a much clearer distinction between the covenant restricting the retention or disclosure of tangible information and the covenant restricting the use of subjective knowledge, the *Equifax* court was not faced with this dilemma. 216 Ga.App. at 37–38, 453 S.E.2d 488. The *Equifax* decision clearly demands, however, that covenants which restrict the dissemination of personal knowledge cannot be drawn with "you can never do so-and-so" type language. *Id.* at 37, 453 S.E.2d 488. Subsection 1b contains no time limit and the words "will be used by me exclusively for the Company's benefit" imply an infinite restriction. Georgia law prohibits trial courts from reconstructing nondisclosure covenants to include reasonable time limits where none already exist. *Allen v. Hub Cap Heaven, Inc.,* 225 Ga.App. 533, 539, 484 S.E.2d 259 (March 5, 1997). Because the covenant incorporates no durational restriction, and because this Court cannot insert one into the covenant, the subsection 1b covenant must be declared void and unenforceable. *Id.; Howard Schultz & Assocs.,* 239 Ga. at 188, 236 S.E.2d 265.

Defendants' Motion for Summary Judgment is **GRANTED** as to the Count One claim for breach of non-competition and non-disclosure covenants. Plaintiff's Motion for Partial Summary Judgment is **DENIED** as to the same count.

III. *Count Two: Plaintiff has substantiated its Tortious Interference claims against Defendants Moore and T–Bo Propane but not against Defendants Tebeau and Turner.*

▇ This Court finds that, as to Defendants Moore and T–Bo Propane, Plaintiff has presented sufficient evidence to substantiate the Tortious Interference with Contractual Relations and Tortious Interference with Business Relations/Prospective Advantages cause of action laid out in Count Two of the Verified Complaint. "To support a verdict for tortious interference with business relations the evidence must show that the defendant (1) acted improperly and without privilege, (2) purposely and with malice with the intent to injure, (3) induced a third party or parties not to enter into or continue a business relationship with the plaintiff, and (4) for which the plaintiff suffered some financial injury." *Arford v. Blalock,* 199 Ga.App. 434, 440, 405 S.E.2d 698 (1991), *aff'd sub nom. Wilensky v. Blalock,* 262 Ga. 95, 414 S.E.2d 1 (1992). To prove that Defendants acted maliciously, Plaintiff need not show that Defendants acted out of any particular hatred for Plaintiff. The term "with malice" refers to any "unauthorized interference, or any interference without legal justification or excuse. Personal ill will or animosity is not essential." *Id.* at 441, 405 S.E.2d 698 (internal quotes and citation omitted). Georgia courts are to give very liberal interpretations to the term "with malice" *McLane v. Atlanta Mkt. Ctr. Mgt. Co.,* 225 Ga.App. 818, 823–24, 486 S.E.2d 30 (March 5, 1997).

▇ In their only credible analysis on this issue, Defendants have argued that they are entitled to summary judgment on this count due to the fact that Defendant Moore approached the AmeriGas customers while he was working for AmeriGas and, therefore, his actions cannot constitute tortious interference with a business relationship. Certainly, there is case law which states that, if he is to be held liable under a tortious interference cause of action, the alleged tortfeasor

cannot be a party to the affected business relationship: "To sustain a claim for intentional interference with business relations, the tortfeasor must be an 'intermeddler' acting improperly and ·without privilege. The tortfeasor must be a 'stranger' to the business relationship at issue; a party, under appropriate circumstances, can be a non-signer of a particular contract and yet not be a stranger to the contract itself or to the business relationship giving rise thereto and underpinning it." *Renden, Inc. v. Liberty Real Estate Ltd. Partnership III*, 213 Ga.App. 333, 336, 444 S.E.2d 814 (1994).

■ At first, this Court was somewhat taken off-guard by the ironic notion that, because Defendant Moore occupied a position within AmeriGas which gave him a particularly *opportune ability to potentially interfere* with that company's business relations, Defendant Moore and, by imputation, Defendant T–Bo Propane, could not be liable under the tortious interference count. *See, e.g., Barnwell v. Barnett & Co.*, 222 Ga.App. 694, 695, 476 S.E.2d 1 (1996) (holding that, even though he was not a signatory to any contract, sales manager for company was not a stranger to the contract and could not be held liable under tortious interference claim asserted by distributor which lost distribution contract with the company as a result of manager's report). Upon further examination, however, it is clear to this Court that this protection applies only to those employees who were acting within the scope of their duties of employment. *See A.L. Williams & Assocs. v. Faircloth*, 190 Ga.App. 872, 875, 380 S.E.2d 471 (1989) (agent of company can be held liable for tortious interference if agent acted outside the scope of his assigned duties). *Compare Johnson v. Rogers*, 214 Ga.App. 557, 559, 448 S.E.2d 710 (1994) (find-

ing that, when tortious interference claims are based upon acts resulting from the execution of an employee's official duties, party has no viable claim if the contractual or business relationship exists with the employee's company); *and Nexus Services, Inc. v. Manning Tronics, Inc.*, 201 Ga.App. 255, 410 S.E.2d 810 (1991) (finding that agent of contracting party is not a stranger to contract when acts complained of were undertaken within scope of agent's employment); *and Integrated Micro Sys., Inc. v. NEC Home Electronics (USA), Inc.*, 174 Ga.App. 197, 200, 329 S.E.2d 554 (1985) (ruling that summary judgment was proper where agent's duties within company A clearly included right to terminate portions of business relationship with company B).

■ In the case *sub judice*, Plaintiff has presented sufficient evidence to show that Defendant Moore was acting beyond the scope of his duties with AmeriGas and more as an *agent provocateur* for the soon-to-be-formed T–Bo Propane. Furthermore, at this point, there is sufficient evidence from which a reasonable jury could infer that Defendant Moore acted at the behest and with the tacit approval of Defendants T–Bo Propane. Therefore, Plaintiff's tortious interference with contractual/business relations claim against Defendants Moore and T–Bo Propane survives summary judgment.

■ At this point, the Court also believes that there is sufficient evidence from which a reasonable jury could find that Defendant T–Bo tortiously interfered with Plaintiff's employment relationships with Defendants Turner, Moore, and Tebeau. *See E.D. Lacey Mills, Inc. v. Keith*, 183 Ga.App. 357, 363, 359 S.E.2d 148 (1987); *Architectural Manuf'g Co. v. Airotec, Inc.*, 119 Ga.App. 245, 166 S.E.2d 744 (1969).[2] Therefore, De-

---

2. The Court makes this ruling with some hesitancy as the cited case law states: "[W]hile even the destruction of a competing·business by means of attracting its customers in the fair course of trade is not actionable, destruction or substantial injury by means of attracting away all or a large percentage of personnel upon whom it must depend to function, especially if other circumstances such as the use of confidential information or misrepresentations as to the plaintiff's financial solvency are involved, is compensable, with lack of actual malice going merely to miti-

gation of damages." *Airotec*, 119 Ga.App. at 251, 166 S.E.2d 744. In *Airotec*, the tortious interference with employment relations claims was allowed to proceed where the defendant had attempted to lure away the entire sales force of the plaintiff and had succeeded with 1/3 of the sales force. *Id.* at 249–59, 166 S.E.2d 744. In *E.D. Lacey Mills*, the defendant hired away seventeen of the plaintiff's sales staff of twenty-one and eighteen of its general employees. 183 Ga. App. at 363–64, 359 S.E.2d 148. In the present case, the facts are not disputed that Defendant T–

fendants' Motion for Summary Judgment is **DENIED** as to Plaintiff's tortious interference claims against Defendants Moore and T–Bo Propane.

Plaintiff, however, has presented to this Court absolutely no evidence to substantiate any element of its tortious interference claim against Defendant Susan Tebeau or Defendant Turner. Therefore, Defendants' Motion for Summary Judgment is **GRANTED** for Defendants Tebeau and Turner as to Count Two. Plaintiff's Motion for Partial Summary Judgment consequently is **DENIED** as to the same count.

IV. *Count Three: Plaintiff has not substantiated claim under Georgia Trade Secrets Act.*

The Georgia Trade Secrets Act of 1990 provides equitable and legal relief to parties whose trade secrets have been misappropriated by another. O.C.G.A. § 10–1–760 *et seq.* Among those trade secrets which the Act originally sought to protect were "customer lists" having economic value and for which the complaining party engaged in reasonable efforts to protect. O.C.G.A. § 10–1–761(4) (1990).

In 1993, the Georgia Supreme Court considered whether this protection extended to information about customers recorded in intangible form, *i.e.* in the memory of a former employee, as opposed to in the tangible form of an actual list contained on paper. *Avnet, Inc. v. Wyle Laboratories, Inc.*, 263 Ga. 615, 437 S.E.2d 302 (1993). In *Avnet,* a large distributor of electronic components sued one of its former managerial employees and his new employer, another major electronics distributor. *Id.* at 615–16, 437 S.E.2d 302. The plaintiff alleged that the former employee had misappropriated customer lists and provided them to the defendant in violation of the Act. *Id.* at 616, 437 S.E.2d 302. The

plaintiff presented evidence that the customers lists "were not freely or widely disseminated and that certain employees to whom the information contained in the lists had been disclosed were required to sign agreements to keep the information secret." *Id.* at 617, 437 S.E.2d 302.

The trial court granted a preliminary injunction ordering the former employee to return any tangible list of customers to the plaintiff but "further ordered that, '[t]o the extent that former employees . . . who are now employed by Wyle[ ] have such information "in their minds," those employees are free to use such information in their employment with Wyle.' " *Id.* at 616, 437 S.E.2d 302. Both parties appealed the scope of the preliminary injunction; the issues on appeal were: (1) whether the trial court erred in ruling that the plaintiff had taken reasonable steps to protect the secrecy of its tangible customer information such that the Act's protections were properly invoked as to that material; and (2) whether the trial court erred in ruling that the Act's protection did not extend to intangible customer information. *Id.* at 616, 618, 437 S.E.2d 302.

The *Avnet* court held that the trial court had not abused its discretion regarding the trade secret status of the tangible customer information. *Id.* at 617, 437 S.E.2d 302. The defendant argued that, because the plaintiff had not required all of its employees to sign non-disclosure agreements, the plaintiff had failed to adequately protect the trade secret status of the customer lists. *Id.* The court disagreed and simply ruled that the plaintiff's efforts constituted "evidence which would authorize the trial court to find that the lists containing specific information regarding [the plaintiff's] actual customers were 'trade secrets' as defined in O.C.G.A. § 10–1–761(4)." *Id.* Consequently, the trial

Bo Propane succeeded in hiring away the lion's share of Plaintiff's Effingham operation. The problem this Court has is that Plaintiff is a national corporation and no realistic argument can be made that any action of Defendant T–Bo Propane threatened the overall stability of the national corporation. The parties are informed that the Court is extremely interested in the issue of whether this aspect of the tortious interference claim against Defendant T–Bo will survive a mo-

tion for judgment as a matter of law at the conclusion of the trial evidence. Therefore, counsel should undertake to thoroughly brief the Court on this subject when the parties submit their Consolidated Pretrial Order in accordance with the future directives of the Court. At the time of the Pretrial Conference, this Court may revisit this ruling and grant Defendants' Motion for Summary Judgment as to this aspect of the tortious interference claim.

court had not abused its discretion in granting the preliminary injunctive relief as to the tangible customer lists. *Id.*

The *Avnet* court also held that the trial court did not err in limiting the scope of injunctive relief to the tangible customer lists. *Id.* at 617, 437 S.E.2d 302. In so ruling, the court looked to the common law of Georgia:

> Prior to the enactment of the Trade Secrets Act, there was a clearly recognized distinction between an employer's lists containing customer information and a former employee's knowledge of customer information. *See Taylor Freezer Sales Co. v. Sweden Freezer Eastern Corp.*, 224 Ga. 160, 165, 160 S.E.2d 356 (1968); *Vendo Co. v. Long*, 213 Ga. 774, 778, 102 S.E.2d 173 (1958); *Stein v. Nat. Life Assn.*, 105 Ga. 821, 32 S.E. 615 (1899). This distinction was based upon the fact that the employer's customer lists were considered to be the *employer's property*, but the former employee's personal knowledge of customer information was not.

*Id.* at 618, 437 S.E.2d 302 (emphasis in original). The court also noted that, under the Act's definition of " 'trade secret,' " a " '*list* of actual or potential customers' is a trade secret." *Id.* at 619, 437 S.E.2d 302 (emphasis in original). Justice Carley, writing for the court, reasoned that because " 'customer information' " was not specifically and separately included in the Act, the Act did not alter the prior common law and, as a consequence, personal knowledge of customer information could not constitute a trade secret. *Id.*

In the Summer of 1996, the Georgia Legislature apparently saw fit to respond to the *Avnet* decision when it amended the Act's definition of trade secret. The italicized wording below indicates the new language inserted into the 1990 Act:

> "Trade secret" means information, *without regard to form*, including, but not limited to, technical or nontechnical data, a formula, a pattern, a compilation, a program, a device, a method, a technique, a drawing, a process, financial data, financial plans, product plans, or a list of actual or potential customers or suppliers which is *not*

commonly known by or available to the public and which information:

> (A) Derives economic value, actual or potential, from not being known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

> (B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

O.C.G.A. § 10–1–761(4) (emphases added) (effective July 1, 1996).

 The question now is: what impact does the amendment's language have on the *Avnet* decision? Plaintiff argues that the "without regard to form" verbiage renders the *Avnet* tangible/intangible distinction meaningless while Defendants argue that *Avnet* is unaffected by the recent amendment. The Court agrees with Defendants.

The only post-amendment case this Court found supports Defendants' position. *See Hub Cap Heaven*, 225 Ga.App. at 533–41, 484 S.E.2d 259. In the *Hub Cap Heaven* case, the Georgia Court of Appeals treated as unaltered the analysis engaged in and conclusions achieved by the *Avnet* court. *Id.* At first, this Court was unsure as to whether the *Hub Cap Heaven* court had utilized the amended version of the Act or was using the pre–1996 version because the decision included no year-reference to the section relied upon nor did it indicate when the underlying lawsuit was filed. This dilemma and the issue of the viability of *Avnet* were resolved, however, when the Court read the following passage:

> Hubcap Heaven also claims it gave Allen information that would allow him to contact suppliers not generally known to competitors. O.C.G.A. § 10–1–761(4) provides that a "list of actual or potential customers or suppliers which is not commonly known by or available to the public" can be a trade secret in some circumstances. Under this statute, however, "only tangible lists of customers are the property of the employer and warrant protection as trade secrets.... [U]tilization of personal knowledge may be forbidden through the

use of restrictive covenants, but not under the Trade Secrets Act." *DeGiorgio v. Megabyte Int'l,* 266 Ga. 539, 540, 468 S.E.2d 367 (1996) (citations omitted). Because Hub Cap Heaven does not claim Allen misappropriated a tangible supplier list, and his personal knowledge of Hub Cap Heaven's suppliers is not a trade secret, this argument has no merit.

225 Ga.App. at 536, 484 S.E.2d 259.

The *Hub Cap Heaven* court was interpreting the amended version of O.C.G.A. § 10–1–761(4) because, prior to the 1996 amendment, the section did not include the qualifier "which is not commonly known by or available to the public." Furthermore, this case shows that *Avnet* remains good law because the cited *Degiorgio* passage relies upon as binding authority the *Avnet* decision. *See DeGiorgio,* 266 Ga. at 539, 468 S.E.2d 367 (citing *Avnet,* 263 Ga. at 620, 437 S.E.2d 302). The *Degiorgio* decision, released on April 8, 1996, was reached before the 1996 amendment while the *Hub Cap Heaven* decision was written well after the amendment. Surely, the Georgia Court of Appeals could have cited to *Avnet* directly. But, as it so frequently does, it merely cited the exact proposition of law which *Avnet* solidified and then cited as the authority for that proposition the most recent state Supreme Court case restating that position. In so doing, they have reaffirmed the validity of the tangible/intangible information distinction and vindicated Defendants' position. And, as a consequence, the Court finds meritless Plaintiff's argument that the "in whatever form" language of the 1996 amendment operates to supersede and render null the *Avnet* decision.

This Court determines that, as a matter of law, the "in whatever form" simply refers to any of a variety of tangible forms upon which customer lists can be created. Companies may create customer lists on notebook paper, parchment, computer disk, microfiche, or on the back of a napkin; such tangible lists are protected by the Trade Secrets Act. The former employee's personal knowledge of the information on these lists, however, can only be curtailed from use through restrictive covenants. *DeGiorgio,* 266 Ga. at 540, 468

S.E.2d 367; *Hub Cap Heaven,* 225 Ga.App. at 540, 484 S.E.2d 259. Though Plaintiff took the step of having its employees sign the restrictive covenants, none of the covenants were legally valid. As a result, the only information that *may* be protected as a trade secret is the actual tangible customer list which Plaintiff claims Defendants misappropriated.

The Court now turns to Defendants' argument that the tangible customer list of Plaintiff is not a trade secret and thus deserving of no protection under the Act due to the fact that the information contained in that list was publicly ascertainable.

Recently, the Georgia Supreme Court considered the trade secret status of a newspaper employer's list of advertising customers. *Leo Publications, Inc. v. Reid,* 265 Ga. 561, 458 S.E.2d 651 (1995). In that case, the advertising director of the *West Georgia Shopper* compiled, during her employment with that company, a list of advertising clients. *Id.* "The list included contact persons, telephone numbers, size, frequency, and rates of advertising." *Id.* The employee left the paper and joined on with a competitor. *Id.* After a bench trial, the trial court declined to permanently enjoin the former employee from using the information from the client list. *Id.* at 562, 458 S.E.2d 651. The Supreme Court affirmed the trial court's decision. *Id.*

In so ruling, the *Leo Publications* court reasoned that the information on the client list could not be a trade secret because it was "readily ascertainable by proper means." *Id.* The court observed that the names of the customers could be complied by reviewing the advertisements in the newspaper, the addresses and phone numbers of the customers could be determined from a telephone directory, and the amounts paid and the contact person "could be obtained by any experienced advertising executive." *Id.* The court did not engage in any analysis as to whether or not the employee actually obtained the information by proper means.

In interpreting the *Leo Publications* decision, the preeminent commentators on the Act had this to say:

This holding demonstrates the significant burden employers bear in demonstrating that a customer list contains trade secrets. In industries in which each competitor's clients are well-known, it may be extremely difficult under *Leo Publications* to demonstrate that a customer list deserves trade secret protection unless it contains specific, highly-detailed information about the customer's preferences, operations, requirements, or other similar information. Under prior common law, customer lists could only be protected from disclosure if they contained such highly specialized information. Thus, Georgia courts likely will not confer trade secret status on customer lists unless the lists contain information in addition to names, addresses and contact persons. The addition of other information such as quantities purchased over several years, negotiated prices, and personal information regarding a customer's internal buyer (such as hobbies, entertainment preferences, etc.) may persuade a court that trade secret status is warranted.

C. Geoffrey Weirich and James R. Glenister, *Revisiting Trade Secrets and Issues of Confidentiality in the Employment Context*, GA. B. J., June 1996, at 35, 37 (emphasis in original).

■ The Court believes that the *Leo Publications* decision, at this point, does not mandate the entry of summary judgment in Defendants' favor. The distinction between that case and the one *sub judice* is the fact that the identities of liquefied propane users are not so blatantly obvious as are the identities of newspaper advertisers. In *Leo Publications*, the Supreme Court's analysis centered on the fact that a competitor could simply pick up the newspaper and easily discover exactly who the newspaper's advertising customers were. 265 Ga. at 562, 458 S.E.2d 651. Defendants argue that the identities are easily ascertainable

since most LP–Gas tanks are above ground and in the public view (and some even have AmeriGas' name printed on them), anyone can simply ride through the county looking for the tanks, and then stop and talk to the people who live in the houses with tanks. In addition, any experienced route salesman or serviceman can simply go through the various telephone books and other directories and pick out those people they know use LP Gas.

(Defs.' Br. in Supp. of Mot. for Summ. J., p. 40.) This statement, while not altogether ridiculous, does not persuade the Court that summary judgment must be granted for Plaintiff's failure to substantiate the non-ascertainable prong found at O.C.G.A. § 10–1–761(4)(A). Rather, issues of fact are in dispute as to this element of Plaintiff's Georgia Trade Secrets Act claim. If the "reasonable efforts" prong of the statutory trade secrets definition is met, this dispute will have to be resolved by the finder of fact.

■ At the same time, this Court does not agree with the following statement of Plaintiff pertaining to Defendants' argument:

This argument fails for a number of reasons. First of all, it is undisputed that riding through the county, looking for the tanks, and stopping and talking to the people who live in the houses with the tanks is not what the Defendants actually did in this case. In this case, the Defendants used a much less burdensome method of solicitation. They misappropriated and misused AmeriGas' confidential specialized customer list. Therefore, their shortcut was at AmeriGas' expense.

(Pl.'s Stmt. in Opp. to Defs.' Mot. for Summ. J., pp. 22–23.) A review of the *Leo Publications* opinion shows that *it does not matter* whether Defendants actually utilized proper means to obtain the subject information. Additionally, looking at the plain language of O.C.G.A. § 10–1–761(4)(A), it is clear that the focus is not upon the action of Defendants but upon the nature of the information. The subsection removes from classification as a trade secret any information which is "readily ascertainable by proper means by[ ] other persons who can obtain economic value from its disclosure or use[.]" Under this portion of the statute, if the information could be (as opposed to was) readily ascertained by proper means, the circumstances surrounding its alleged misappropriation is, quite simply, irrelevant. It does not matter if the offender engaged in a Watergate type burglary to get the list or if the offender innocently found

the list laying on a church pew wrapped in a purple ribbon with a pink bow.

The inquiry simply boils down to the question: was this information truly a *secret?* To be quite frank with the parties, while the *Leo Publications* decision does not totally exonerate Defendants, its broadly inclusive language certainly would favor Defendants' position if ever the time comes to charge the jury. Indeed, common experience tells the reader that most residential LP tanks are in people's backyards and that a passerby could not see them without trespassing. But common experience and the Georgia courts' broad understanding of "publicly ascertainable" are, perhaps, at loggerheads; it would appear as if the Georgia courts simply have construed names and addresses as public information and lost the will to protect as trade secrets compilations of names. *See, e.g., Equifax,* 216 Ga.App. at 35–36, 40, 453 S.E.2d 488 (affirming without lengthy explanation trial court's ruling that, because no great affirmative efforts of secrecy were taken to protect them, extensive and exclusive lists of names and addresses of foreign investigators and customers were publicly ascertainable). In passing, this Court comments that, given the current state of the law in Georgia, the information could be publicly ascertainable by proper means but, because the Court does not find that the information is irrefutably publicly ascertainable by proper means, this prong of the trade secrets definition has been substantiated by Plaintiff.

The Court now focuses upon the "reasonable efforts" prong of the trade secrets analysis set forth in O.C.G.A. § 10–7–761(4)(B): the Court must find that there Plaintiff has produced information tending to show that the list was "the subject of efforts that [were] reasonable under the circumstances to maintain its secrecy." The language of this portion of the statute indicates that the Court's

attention turns to the actions of Plaintiff as opposed to the nature of the information. *See Equifax,* 216 Ga.App. at 39–40, 453 S.E.2d 488.

In *Equifax,* the Georgia Court of Appeals considered, in addition to the breach of the nondisclosure covenant claim discussed in § II *supra,* a Georgia Trade Secrets Act claim. 216 Ga.App. at 39, 453 S.E.2d 488. The *Equifax* court focused on the O.C.G.A. § 10–1–760(4)(B) requirement and found that, as a matter of law, the plaintiff had not engaged in reasonable efforts to maintain the secrecy of the customer lists. *Id.* at 39–40, 453 S.E.2d 488. In so ruling, the court cast aside the plaintiff's arguments that its universal requirement that its employees sign confidentiality agreements constituted a reasonable effort. *Id.*

Under the particular circumstances of the case, the *Equifax* court found that the plaintiff's isolated step of requiring all of its employees to sign confidentiality agreements was insufficient to amount to evidence of reasonable efforts to protect the secrecy of the information. *Id.* at 40, 453 S.E.2d 488. This conclusion was bolstered by the fact that the allegedly misappropriated information was publicly ascertainable [3] and by the fact that the confidentiality agreement at issue was overbroad and unenforceable as well as several years old. *Id.* In an undeveloped thought, the court observed that it did not intend to declare a bright-line rule precluding relief under the Act to every employer who has taken no step other than requiring employees to execute confidentiality agreements: "On the contrary, the formality involved in requiring an employee to sign a nondisclosure agreement designed to protect specific information may well be the only reasonable step that can be taken to document the employer's position and to serve as a caution against indiscretion." *Id.*

**3.** In *Equifax,* the trial court ruled that the plaintiff's extensive clients lists which included the names of actual and potential customers, as well as plaintiff's extensive "foreign correspondents" lists, were publicly ascertainable. 216 Ga.App. at 40, 453 S.E.2d 488. The Court of Appeals left undisturbed this finding. *Id.* Under *Equifax,* this Court certainly could have declared the customer list to be publicly ascertainable and granted Defendants' Motion for Summary Judgment on that

ground. However, because the *Equifax* case did not describe in any significant detail the quality of the information on the lists, this Court hedged and found that Plaintiff had just barely presented a triable issue. This Court is confident that, were the *Equifax* court reviewing this case, it would find the information publicly ascertainable. Therefore, this element of the *Equifax* court's reasoning is applicable in the instant case.

The reasoning and holding of the *Equifax* case persuades this Court that Plaintiff's Georgia Trade Secrets Act claim cannot survive summary judgment due to the fact that Plaintiff has failed to proffer evidence that it took reasonable efforts to secure the secrecy of the information. Like in *Equifax*, the only affirmative act taken and referred to by Plaintiff is the requirement that the individual Defendants sign the confidentiality agreement.[4] This Court has already declared these agreements invalid and unenforceable. Additionally, the subject information was, as this Court has concluded, most likely publicly ascertainable. While reviewing the depositions in this case, it is evident to this Court that Plaintiff did not protect the secrecy of the customer lists in any careful manner a la the Candler family protecting the secrecy of the Coca–Cola recipe. Rather, the evidence shows that copies of the customer lists freely floated around the office without any system in place to track or monitor the whereabouts of the lists. (*See, e.g.,* B. Watts depo., pp. 10–11.) This throws into question the legitimacy of Plaintiff's efforts to maintain the secrecy of its lists.

Under the *Equifax* decision, Plaintiff's sole step of requiring its employees to sign an unenforceable confidentiality agreement cannot, as a matter of law, amount to reasonable efforts to protect the secrecy of the subject information. 216 Ga.App. at 39, 453 S.E.2d 488. Therefore, Defendants' Motion for Summary Judgment is **GRANTED** as to Plaintiff's Georgia Trade Secrets Act claim found in Count Three.[5] Plaintiff's Motion for Partial Summary Judgment is **DENIED** as to the same count.[6]

## V. *Conclusion.*

Defendants' Motion for Summary Granted has been granted as Counts One and Three while Plaintiff's Motion for Partial Summary Judgment has been denied in its entirety. Defendants' Motion for Summary Judgment has been granted for Defendant Turner and Defendant Susan Tebeau as to Count Two; Defendants' motion has been otherwise denied as to Count Two. Therefore, the Clerk of Court is **DIRECTED** to dismiss Defendant Larry Turner and Defendant Susan Tebeau from this case. The tortious interference claims against Defendants Moore and T–Bo Propane are the only remaining causes of action in this suit.

The Court will consider vacating the Preliminary Injunction issued in this case when so moved by Defendants.

---

4. In the preliminary injunction hearing, Mr. MacBride gave the following statements in response to queries from Defendants' counsel:

 Q: Now, with respect to the lists and files, other than requiring employees to sign a confidentiality agreement, are you aware of any other efforts that AmeriGas takes to keep such information confidential?

 A: No, we entrust our employees with this confidentiality. They have to have it to do their daily business.

 Q: So the confidentiality agreement's the only thing that you do to try and keep this information confidential, is that correct?

 A: To our employees, yes.

 (MacBride Test., Prelim. Inj. Hrg. Trans., p. 32.)

5. The Court believes that this ruling may, in effect, mandate the vacating of the preliminary injunction hearing. This Court will entertain a motion from Defendants requesting that action and will consider Plaintiff's response thereto. Plaintiff is forewarned, however, that it should not utilize the opportunity to respond to the Defendants' motion as a request for reconsideration of the Court's rulings contained in this Order. The only question is whether injunctive relief may be proper through the sole remaining cause of action, Count Two of Plaintiff's Verified Complaint.

6. This ruling may leave a funny taste in the reader's mouth due to the fact that it would appear that Plaintiff has been deprived of an interest in personalty through Defendants' actions. Had Plaintiff proceeded on an alternative theory of conversion or misappropriation of personal property, then this Court may have allowed that claim to proceed. *See Equifax,* 216 Ga.App. at 41–42, 453 S.E.2d 488. However, as Plaintiff has not presented that alternative cause of action, this Court will not treat Plaintiff's case as one proceeding under that theory. *Id.*